IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 15, 2008

STATE OF TENNESSEE
DEPARTMENT OF CHILDREN'S SERVICES v. V.N., ET AL.

Appeal from the Juvenile Court for Greene County
No. J20604     Kenneth N. Bailey, Jr., Judge

No. E2008-01032-COA-R3-PT  -  FILED OCTOBER 27, 2008

The State of Tennessee Department of Children's Services ("DCS") filed a Petition to Terminate Parental Rights of V.N. ("Mother"), T.W., and any unknown father to the minor child K.B.N. ("the Child"). T.W. signed a Waiver of Interest and Notice waiving any rights he may have to the Child. After a trial, the Juvenile Court entered an order finding and holding, *inter alia*, that clear and convincing evidence of grounds existed to terminate Mother's parental rights to the Child under Tenn. Code Ann. §§ 36-1-113(g)(1), (g)(2), and (g)(3), and that it was in the best interest of the Child for Mother's parental rights to be terminated. Mother appeals the termination of her parental rights to this Court. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;
Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and SHARON G. LEE, SP. J., joined.

Leslie E. Douthat, Greeneville, Tennessee for the Appellant, V.N.

Robert E. Cooper, Jr., Attorney General and Reporter; and Elizabeth C. Driver, Senior Counsel for the Appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in June of 2001. In the summer of 2006, the Child was taken into State custody. At that time, Mother was in jail. Mother had left the Child with her mother ("Grandmother"), but Grandmother had been arrested and taken to jail on a DUI charge leaving the Child with Mother's sister. The Child was taken into State custody after Mother's sister was arrested for a fourth DUI, among other things.

On February 28, 2008, DCS filed a Petition to Terminate Parental Rights of Mother, T.W., and any unknown father, to the Child. T.W. signed a Waiver of Interest and Notice waiving any rights he may have to the Child. The case proceeded to trial in May of 2008.

At trial, Grandmother, who had filed a petition for custody of the Child, testified that she wished to withdraw her petition, and that she believed that the Child was in the best placement for her with the foster family. Grandmother stated: "I can't provide for her really, and I'm too old to take care of her. I can't give her the things that somebody else can."

Brenda Sharon Yusco a therapist with Nolachuckey Mental Health Center has been treating the Child since January 11, 2007. Ms. Yusco sees the Child one to three times a month depending upon the Child's needs. Ms. Yusco testified that the Child has not spoken much about Mother, but has spoken about her foster parents. Ms. Yusco testified that the Child's feelings for her foster parents are "[g]enerally very positive, seems to have a relationship, a positive relationship and feels a sense of security with them." Ms. Yusco further stated that the current foster placement:

> appears to be very stable. They're very nurturing with [the Child]. They both seem very invested. They both come to sessions with [the Child] and they come regularly to the sessions. They seem very interested in her well-being. They make regular school contacts. The foster mom is always able to inform me of school progress. She's familiar with the teacher, so has a real good relationship with the school situation. And they, they appear very nurturing in sessions with her.

Ms. Yusco testified that her intake record regarding the Child reveals:

[the Child] was, is brought to the Center by Becky Hite, DCS and Pam, her current foster parent. It was, she was having a lot of anger problems, often the behavior's at night prior to bedtime. She had scratched the foster mother and scratches herself when angry. Gets very angry, gets tense, wants to scratch. She gets upset afterwards and needs reassurance. [The Child] went into custody 7/30/2006. She was in a different foster home prior to Pam. [The Child] was removed from this home. [The Child] has been at Pam's since 11/27 of 2006. [The Child] also has some tantrums at school. School behavior has improved. Easily frustrated. [The Child] was

removed due to being in the car with an aunt who was drinking and driving. Grandmother who had custody was incarcerated at the time.

When asked if it would be damaging to the Child to be in limbo for the next nine to twelve months waiting for Mother to be released from jail and work a permanency plan, Ms. Yusco stated:

As [the Child's] presented with the stressors, when she's faced with stressors, the instability could be very harmful for her, just based on what I've seen and when she deals with the stress in her life. I mean, she becomes so anxious and, you know, almost wants to isolate herself at the foster home, and she's very fearful of separation. You know, I, at times it's almost appeared there [is] some post-traumatic stress for [the Child], although I, I have at this point not diagnosed that.

Ms. Yusco anticipates that the Child will need to be in counseling for at least another year or two.

Becky Hite, a former DCS case worker in the Greene County Office, worked this case beginning in August of 2006. Ms. Hite testified regarding the initial Permanency Plan dated August 16, 2006 ("First Perm Plan"). Ms. Hite testified regarding the tasks to be accomplished by Mother under the First Perm Plan stating:

The first one was that she would complete alcohol and drug treatment and maintain an alcohol and drug free lifestyle. That she would be able to provide financially for herself and her child, and that she would have the parenting skills necessary to parent her child. That she would have stable employment. That she would have safe and independent housing. That she would not let anyone in her home using illegal drugs. That she would do the parenting assessment and follow recommendations. That she would submit to random drug screens. That she would resolve her legal issues and comply with the rules of probation. That she would enroll in counselling (sic) at the Mental Health Center or with a private provider, and that she would do the alcohol and drug assessment and follow the recommendations.

Mother did not sign the First Perm Plan on the advice of her previous counsel. Ms. Hite testified that she read the First Perm Plan to Mother, explained it to her, and asked Mother if she had any questions about it. Mother also was given a copy of the First Perm Plan. Ms. Hite testified that even though the First Perm Plan was only ratified for Grandmother, Mother had knowledge of it and was working toward it. Ms. Hite reviewed the First Perm Plan with Mother while Mother was incarcerated and then again after Mother was released.

Mother was incarcerated for the majority of the time Ms. Hite worked on this case. Ms. Hite testified that Mother did not complete a rehab program and did not have independent housing or a job when she was released from jail. Mother had been employed in the past and never told Ms. Hite that she didn't know how to find a job. Ms. Hite stated: "We discussed housing, like her trying to get independent housing, not, not living with somebody else, but actually getting an apartment with her name on the lease so nobody would be able to kick her out, you know, or

anything if she didn't actually rent the apartment." Mother did not obtain housing while Ms. Hite was the case manager for this case. Mother did submit to some random drug screens and did have a parenting assessment. Mother took a drug screen on June 12, 2007 and it was negative. Ms. Hite testified that Mother completed an A&D assessment and a parenting assessment.

Mother was released from jail on August 31, 2006 and was back in jail on September 8, 2006. Mother was released from jail on February 7, 2007 to have another baby and was back in jail approximately three weeks later to finish serving her time. Mother was supposed to complete the tasks on the First Perm Plan by February 16, 2007.

When asked what was done to assist Mother, Ms. Hite stated:

DCS had Solutions to help her with the parent[ing], to do the parenting assessment and they were following through with any recommendations from the assessment, such as parenting education classes, supervised visitation when she was out of jail. We were also, when she got out of jail we were working on trying to get her some housing. She, she had a list of places she could check and she was checking on some herself and DCS was going to try to assist her with, like getting the electricity hook-up, the, the deposit for the rent and things like that.

When Mother got out of jail, DCS set up substance abuse treatment for her with Nolachuckey Mental Health. Ms. Hite testified that DCS did a referral for drug screens because Mother could not afford them herself, helped Mother with the mental health intake at Nolachuckey, and tried to assist Mother with finding housing. Ms. Hite testified that when Mother was out of jail:

She did complete the assessment at Nolachuckey Mental Center, the mental health intake appointment. I don't know if she followed through with any of the recommendations. She did not get employment. She did not get independent housing.

Ms. Hite testified that Louise Verran, the Solutions worker, conducted supervised visitations with Mother, Grandmother, and the Child approximately half a dozen times and that as part of that visitation, Ms. Verran worked to provide a generic parenting class.

From April 19, 2007 through June 27, 2007, nine visits were scheduled for Mother with the Child, but Mother attended only four of these and was late for one of those four. The family visit of June 27, 2007 was a birthday party for the Child. Mother had promised to bring a cake and presents, but she failed to show up.

By order entered August 1, 2006, the Juvenile Court found that reasonable efforts were made to prevent the Child's removal from the home. Ms. Hite ceased being the case manager in May or June of 2007.

The case was transferred to another case worker, Brooke Slocum, on June 20, 2007. Another permanency plan dated July 12, 2007 ("Second Perm Plan") was prepared and was

introduced at trial during Ms. Slocum's testimony.  Mother did not sign the Second Perm Plan and objected to its introduction at trial claiming that it constituted hearsay.  The Juvenile Court entered the Second Perm Plan over Mother's objection.  The Second Perm Plan is substantially similar to the First Perm Plan with regard to the tasks for which Mother was to be responsible.  The Juvenile Court entered an order September 14, 2007 approving the Second Perm Plan and finding that DCS "has used reasonable efforts to reunite the child with the mother and has attempted to work with the mother, but she is not cooperative."

Ms. Slocum testified regarding Mother's visitations with the Child stating:

[Mother] had, when I became the case manager, the 6/27/07 visit, which was the birthday party that she didn't show up for, the 7/5/07 visitation that she didn't show up for, and the 7/11 visitation, or actually the 7/5 was offered to her but she chose not to.  She wanted it for the following week.  And then 7/11 was a no-show where the supervisor and [the Child] waited at McDonald's.  And then there was a 7/19/07 visitation that I supervised.

When she supervised the visit, Ms. Slocum observed:

There was minimal interaction between [the Child] and [Mother].  There was numerous family members there.  [The Child's], or [Mother's] son was brought in by a relative.  [Mother] went outside; she smoked a cigarette.  She interacted with a police officer.  [The Child] played mostly in the, the play yard and with the, the child of a friend of [Mother's] that brought [Mother] to the visitation.

By the time of this visit almost a month had elapsed since Mother had last seen the Child.  After July 19, 2007, there were no more visitations because Ms. Slocum was unable to locate Mother.  Ms. Slocum tried to contact Mother by phone and through Grandmother, but was unable to contact Mother.  Mother did not call Ms. Slocum.  Ms. Slocum testified: "I talked with [Mother] at two visitations that I was present at, the, the one where I was introduced to her and that was on 6/20/07, and then that visitation on 7/19/07.  Otherwise, it was me attempting to contact her."

When asked if she checked to see if the Greene County Jail, where Mother was incarcerated, had programs available to assist with things like housing and drug assessment, Ms. Slocum stated: "I had been informed on another case that, and I do know that state prisons have those kinds of facilities, that Johnson City may, but I was informed that Greene County did not, apparently…."  Ms. Slocum testified that to her knowledge DCS has never provided any type of services to someone in jail.

When asked if the Child ever told her anything about Mother, Ms. Slocum stated:

She has, I mean, kind of historically said that she worries about [Mother].  Said that she, most specifically, I think because it's the freshest in my memory, the last visit that we had on April 30th, she asked if her mom was still in jail.  I asked what she knew about jail, and she said that she had been there.  And I kinda looked at her and

-5-

she said I didn't do anything bad. And I said okay, and she said she went to visit her aunt there, that she worried if her mom was doing really well and she wanted her mom to do well.

Although Mother had an opportunity to work the permanency plan when she was released in April and out of jail until June, Mother still was substantially noncompliant with the plan during that time period. Ms. Slocum testified that Mother completed only one component of the permanency plan, getting a psychological assessment, but that Mother did not follow through with the recommendations of that assessment.

Ms. Slocum testified that in her opinion it is in the Child's best interest for Mother's parental rights to be terminated. Ms. Slocum testified that the Child's foster parents want to adopt the Child.

Karen Brown, a probation officer with the First Tennessee Human Resource Agency, testified that Mother was placed on probation with her in 2002. Mother was already on probation when Ms. Brown joined the First Tennessee Human Resource Agency. Mother has been on probation with Ms. Brown on and off since 2002.

Ms. Brown testified that in April of 2007, Mother was on probation "for a theft, driving on suspended, and I think paraphernalia, possession of drug paraphernalia." Ms. Brown saw Mother in June of 2007. In July of 2007, Ms. Brown had a warrant issued on Mother for violation of probation. Mother pled guilty to this charge. Mother then was incarcerated on a separate matter in September of 2007. When asked whether she had drug screened Mother, Ms. Brown testified:

> The last time I screened her - one thing I guess I need to explain is I haven't seen [Mother] that much. Most of the time she's either violated or in jail. So the best that she's ever done was last year in, in May and June when she reported. I did not drug screen her either of those times. I didn't feel the need to. She was, she was actually doing pretty well….But she got in trouble again. But I have drug screened her, probably in several years. I would go back at least four years. Most of that time she's either incarcerated or she's out on a violation warrant.

Ms. Brown agreed that since her initial contact with Mother in 2002, Mother has been in jail more than she's been out on probation.

Terry Landers testified for Mother. Mr. Landers has known Mother for about seven years as a friend. Mr. Landers is disabled, and he testified that Mother cleaned his house and washed clothes for him. Mr. Landers testified that Mother did not have a place to stay when she was released from jail to have a baby, so:

> I told her I need somebody to do my laundry and wash dishes and cook and stuff like that. So I told her - I've, I've got a two-story house and it's got an upstairs, got two, two bedrooms upstairs and a big walk-in closet.…And I told her she could just move up there and I could pay her a wage or something, you know, to help, help me out.

Mr. Landers testified that he has "8 and a half acres of property and a barn and a chicken house and a two story house. It's got 1, 2, 3, 4, 5 bedrooms, a kitchen and a living room."

Mr. Landers trusts Mother and stated: "[s]he's a real good person. She's kind hearted." Mr. Landers thought that Mother was in jail for violating probation, but did not know what Mother was on probation for, and did not know that Mother has been in jail twenty times since 2002.

Mother testified at trial. She was asked if she understood the things she was supposed to do under the permanency plan and she stated: "No.…Yeah. I didn't understand the, I've never had to depend on myself so really, I didn't even know what place to work." When Mother was asked what services were offered to her by DCS, she stated:

> There were services offered to me, but it wasn't really nothing to help me. They never really showed me the way in doing anything. I mean, they would explain stuff to me, but I've, I've never really had to depend on myself before, so I really didn't know what to do.

Mother was questioned about the time she was out of jail from April 19, 2007 through August 28, 2007. She stated:

> Well, when I got out of jail I went, I had my other two kids and I know that I, I did the wrong by going, I went and got my other two kids, which I shouldn't have done, because it was too much on me and I couldn't do it. Trying to work, trying to take care of both of my other kids, do probation and trying to do, complete Permanency Plans for [the Child], I couldn't do it all. But I was trying to do all that I could and put all the effort that I could at that time in on it.

Mother testified that when she got out of jail in April she went back to work taking care of Mr. Landers and stated: "I didn't work for him every day though. I just worked enough to where he would pay my court costs and my fines.…'Cause his son was living there and I couldn't stay with him at that time because he was providing a home for his son." When asked if she considered the Child's interests at all while she was out of jail, Mother stated: "Yes, I did, but I knew that I couldn't do it. I wasn't getting no help from nobody so it was hard to do. I don't have license (sic) and I don't have no car. I don't have nobody to help me. My family's in my situation so…."

When asked why DCS was unable to get in touch with her, Mother stated:

> I didn't, 'cause I didn't have no place to live, I didn't have nowhere to have a phone.…I had to take my other two kids back to the people that had temporary or had prior attorney (AS STATED) of them because I couldn't support them and I couldn't do it all by myself. So I just pretty much gave up at that point.

Mother also testified:

Well, I've been, I'm just going to put it like this. I know [the Child] - I've had a rough life all my life and I know she's probably better off where she's at, but I want to see her and I love her 'cause she's my baby. And I know they can probably provide better than what I can. But I love her, you know. That's all I ask, is for visitation with her. I know I probably couldn't give her what they can give her. I know they can give her more, more than I can. The only thing I ask of the Court whatsoever is that I can get visitation with her. I'll let them adopt her or whatever it takes. I just want to see her if I'm doing good. And I've been trying to do my GED in jail. I've been taking, I'm taking my practice test right now. And I, I mean, I mean, I can ask for another chance but I'm sure I'm not going to get, but I want to do everything I can to see my kids because I love my kids. Yeah, I've had a drug problem for years and I've never been able to get in rehab. I've never, I've never even had any help to, you know, get to that point of rehab. I've tried to do it on my probations and stuff and I couldn't get in. And it was just too much on me at one time and I'd get out there and mess with the wrong people. I want to make a life for my kids, though. I know when I get out I'm not going to be on no paper because Terry's going to pay my probation officer. So I don't think I'm going to be in any more trouble 'cause drugs ain't my thing no more and I'm done with them. I can't, I don't know. I guess, I just want to be a part of [the Child's] life 'cause I know she loves me and I love her. All I ask is for some type of visitation with her.

Mother testified that she was due to get out of jail in June. Mother testified that she is going to live at Mr. Landers' house when she gets our of jail and stated:

he's going to give me, when I get out that's where I'm going to go and stay. He's got, he has put a bed in an extra room and I'm going to start taking care of him from the time I get out of jail on. He's going to pay my, he's going to help me get on my feet.

When asked why she missed visitations, Mother stated: "Because I didn't have no ride, and they, they moved visitation from my mama's and I was always, I would always stay with my mom where I could see [the Child] and I just didn't have no transportation.…My mom didn't have, they wouldn't, they didn't have our visits together." Mother testified that she failed to show up at the Child's birthday party as promised: "'Cause I didn't have nothing to give her, and I didn't want to, I didn't, I was embarrassed. I didn't show up, 'cause I didn't want to hurt her no more 'cause I didn't have nothing. I had no job. I had no way of getting her anything." Mother volunteered to bring the things to the birthday party "[b]ecause I thought I could do it."

Mother testified that the Child lived with Grandmother and stated: "she's always lived with my mom but I've always lived with my mom. So we was always together.…I've always lived with [the Child]. I just, my mama always had custody because I was in and out because I was on drugs and I couldn't, I was just, I was pretty much, I would go to my mom's to spend time with [the Child] and leave."

When the guardian ad litem asked how Mother could convince the court that things would be different this time, Mother stated:

> I, I get out in a month.…Why am I changing? Because…Because, like I said, I got out and I had every, I still got every intention I'm doing right for her, but I put too much on me at one time. I was having too much and I wasn't having enough help and I couldn't do it by myself.…Which now I have Terry that's going to help me pay my financials and, and I can take care of him and he's going to provide me a place to live, and he's got a five bedroom house and they ain't nobody living there but him. And I'm, I'm willing to do whatever to get her back, or I'm doing whatever to get visitation with her. I just, I just know I don't want to be took out of her life. And it don't matter what I have to do. I, the reason, the whole point is I thought my mama was going to get her back anyway. That's the whole reason I really didn't - - I mean, I did what I had to do but I didn't really try, try as hard as I could, because I thought Mama was getting her back. Mama told me she was getting her back. Mama had done everything she was supposed to get her back so I thought she was getting her back.

After trial, the Juvenile Court entered an Order Terminating Parental Rights on June 19, 2008 finding and holding, *inter alia*:

> The Court finds, based upon the testimony and the facts that have been presented here today, that the grounds, by clear and convincing evidence, exist under Tennessee law for abandonment; that given [Mother's] lifestyle and conduct prior to her most recent incarceration, that she exhibited a wanton disregard for the welfare of her child, given the fact that she's had nineteen prior incarcerations prior to the most recent one. Furthermore, that she had a drug addiction, which she has admitted to the psychological examiner, which is a wanton disregard for the welfare of her child, and she admitted that her mother was essentially taking care and raising her child. So I find the Department has met the grounds for abandonment.

> Secondly, I find the Department has met the clear and convincing burden of proof of the grounds for substantial noncompliance, by [Mother], with the responsibilities in the Permanency Plan. The Permanency [P]lan was adopted by this Court in September of 2006 and which [Mother] received a copy. Even though she refused to sign it on advice of counsel, she did receive a copy of it, knew that it required her to do certain things, and she failed to do those things. She was to complete an Alcohol and Drug Assessment and follow the recommendations. She was to complete a rehab program and participate in aftercare by attending AA or NA meetings. She didn't complete a rehab program and there's no evidence that she attended any AA or NA meetings. She did not, and there's been no testimony that she submitted to counseling at the Mental Health Center. There's been no testimony that she had resolved her legal issues, and actually after this Permanency Plan was put into effect she added to her legal issues with further incarcerations. I further find that under the Permanency Plan she [was] required to obtain and maintain

employment. She was not able to do that. She was working for this Mr. Landers, but there has been no proof of what her actual pay was or pay stubs or bank account records. And further, she did not complete the parenting assessment, and she was out of jail for a period of five months, and during that time she only visited her child five times. And so there was really no effort being put forth by [Mother] to substantially comply with or even comply at all with the Permanency Plan, and the Court finds that there was ample evidence presented to prove that she substantially failed to comply with the Permanency Plan.

Ground Number 3, the Court finds as to the termination, by clear and convincing evidence, of [Mother's] rights is for the persistence of conditions. At the time this child was removed by the Department of Children's Services, the grandmother, who was the custodian of the child at the time, was in jail. The mother…was in jail, and an aunt, who had just physical custody of the child, did not have legal custody, was arrested for a DUI forth offense. And so there was a valid basis for the child to be placed in the care and custody of the Department of Children's Services.

The conditions which led to that removal still exist, and there's been no evidence that they've been remedied, and given the fact that the mother is still in jail, there is little likelihood the conditions would be remedied at an early date. The Court believes, even upon her release in late June of 2008, that it would take [Mother] at least a year to work a Permanency Plan (and the Court believes she would not be successful) and that would just mean that the child would be in custody for another twelve months, which would put her at almost 32 months being in custody of foster care. And the Court finds that that's unreasonable and is not in the best interest of the child.

The Court also finds that the continuation of a parent/child relationship between [Mother] and [the Child] would greatly diminish the child's chances of early integration into a safe, stable and permanent home. Based upon the testimony of all those involved, the child's current placement is in her best interest. It is a stable and safe and permanent home, and the foster parents are willing to adopt. So the Court finds that by clear and convincing evidence grounds exist for termination of [Mother's] rights based upon the persistent (sic) of conditions, substantial noncompliance and abandonment.

As to the second prong of a termination of parental rights, the best interest of the child, the Court finds that by clear and convincing evidence that it would not be safe at this time for the child to be returned to the mother or her home. The Court finds that the mother has failed to make an adjustment in her life, a lasting adjustment at this time to allow for reunification. The Court finds that a change at this time of the caretakers of this child would have a detrimental, emotional, psychological effect upon the child because she is attached to her foster parents. The Court has no doubt that this child loves her grandmother and loves her mother, but

that the child has found a safe and stable home, and the Court believes that's in the child's best interest.

The Court wishes to comment on the [Grandmother's] testimony today, and to say it appreciates the fact she has her granddaughter's best interest in mind when she testified that she thought her granddaughter was in a good placement; the foster parents were taking good care of her. Actually, she said "the best care." And so I appreciate her honesty with that. The Court knows that it's tough for a grandmother to have somebody else taking care of her granddaughter, and I know it's tough for her to sit here and look at her daughter and say that she thinks her granddaughter is in the best place.

Furthermore, the home where the child would be, if in the custody of the mother, is not an appropriate home. Based upon prior history, there's been criminal activity around the child when she's been in the custody of the mother, given her drug use and other problems that have led to her incarceration. So the Court finds that by clear and convincing evidence that it is in the best interest of the child that the parental rights of [Mother] be terminated.

As to [T.W.], [he] has signed a waiver of any rights that he may have to this child. The Court finds that said waiver is proper and appropriate. The Court also notes that it's in the best interest of [the Child] that the relationship and any parental rights of [T.W.] be terminated and it is in her best interest that she remain in her current placement based upon the termination of the rights of [T.W.].

Mother appeals the termination of her parental rights to this Court.

**Discussion**

Although not stated exactly as such, Mother raises six issues on appeal: 1) whether the Juvenile Court erred in failing to grant Mother a continuance; 2) whether the Juvenile Court erred in admitting the two permanency plans; 3) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights for abandonment; 4) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights for failure to substantially comply with the permanency plan; 5) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights on the ground of persistent conditions; and, 6) whether the Juvenile Court erred in finding clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn.

R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to

-12-

whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We begin by addressing whether the Juvenile Court erred in failing to grant Mother a continuance. "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997) (citations omitted).

The Juvenile Court found Mother to be indigent and appointed her an attorney by order entered March 13, 2008. Apparently, Mother was not happy with that attorney and she 'fired' the attorney and requested that new counsel be appointed. The Juvenile Court appointed Mother's current attorney by order entered May 1, 2008, nunc pro tunc to March 25, 2008. At trial, the Juvenile Court heard argument on Mother's motion for continuance. Unfortunately, this motion is not in the record on appeal. The trial transcript shows that Mother's attorney stated that the motion for continuance was filed "due to the late date of my appointment" and because Mother "feels it would be in her best interest to allow Counsel more time to adequately prepare." The Juvenile Court denied the motion stating:

Well, Ms. Douthat was recently appointed, however that was done so at the request of [Mother]. She had asked for a new attorney. The Court reluctantly agreed to appoint a new attorney, but she has put her attorney in this position herself by dismissing her former attorney. So I'm not going to continue the case today.

As pertinent to this issue, Tenn. Code Ann. § 36-1-124 provides:

**36-1-124. Contested terminations of parental rights and adoptions – Appeals – Expedited schedule. –** (a) In all cases where the termination of parental rights or adoption of a child is contested by any person or agency, the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

\* \* \*

(c) It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36-1-124 (2005).

In her brief on appeal, Mother states that her "present counsel was appointed a mere forty-five (45) business days prior to the Termination Proceeding." Mother argues that had she had:

an opportunity to investigate adequately, [Mother] would have subpoenaed Louise Verran of Solutions to verify that the therapeutic visitation was provided only to [Grandmother], which would have proven more efficiently that the Department failed to make reasonable efforts to [Mother] and negating (sic) the allegation of failure to comply with the permanency plan. [Mother] did have the records from Ms. Verran; however, those records are not indicative of the interaction Ms. Verran had with [Mother] and or the interaction Ms. Verran had with [Grandmother]. Therefore, [Mother] did ask for another continuance in order to obtain the testimony of Ms. Verran; however, that was denied as well.…[Mother] argues Ms. Verran's testimony would have illustrated that the therapeutic visitation was only conducted with [Grandmother], never [Mother], which would prove the Department failed to provide reasonable efforts to assist [Mother] in complying with the permanency plan.

Unfortunately for Mother, even if Ms. Verran had been called to testify and her testimony had shown what Mother asserts it would have, Mother failed to exercise most of the visitations offered to her. It defies logic to assume that if visitations had been provided to Mother by Solutions, rather than by DCS as was done, that this would have made any difference in the outcome of the case given the fact that Mother chose to not show up for many of her visitations.

Given our Legislature's clear directive regarding expediting contested parental termination proceedings, the fact that we are unable to review Mother's motion for continuance to determine what specific grounds were raised in the motion, and Mother's admission in her brief that her current counsel had forty-five business days prior to trial to prepare, we are unable to conclude that the Juvenile Court abused its discretion when it denied Mother a continuance.

Next, we consider whether the Juvenile Court erred in admitting the permanency plans. Mother argues in her brief on appeal that it was error to admit the two permanency plans, which Mother did not sign, because they constituted hearsay as Mother "did not make the statement, manifest an adoption of the statement, authorize anyone to make the statement for her or any of the other exceptions under [Tenn. R. Evid. 803]." The First Perm Plan was ratified by the Juvenile Court in September of 2006 and was admitted at trial during the testimony of Ms. Hite, the DCS case manager who prepared the First Perm Plan. Mother did not object to the introduction of the First Perm Plan.

As this Court stated in *Grandstaff v. Hawks*,

> Objections to the introduction of evidence must be timely and specific.
>
> * * *
>
> A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. Failure to object [to] evidence in a timely and specific fashion precludes taking issue on appeal with the admission of the evidence.

*Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) (citations omitted).

As Mother raised no objection at trial to the introduction of the First Perm Plan, Mother is precluded from raising this issue on appeal.

The Second Perm Plan was introduced during the testimony of Ms. Slocum. Mother raised an objection based upon hearsay at trial to the introduction of the Second Perm Plan. The Juvenile Court admitted the Second Perm Plan stating it was doing so "because it was ratified in Court, and it was the Plan for the child…." Our review of the record on appeal reveals that the Second Perm Plan was substantially similar to the First Perm Plan, which was introduced without objection, particularly with regard to the actions and responsibilities expected of Mother.

As this Court stated in *Delapp v. Pratt*:

> Issues regarding admission of evidence in Tennessee are reviewed for abuse of discretion. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Id.* Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:
>
>> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.
>
> *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).
>
> Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v.*

-15-

*Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

*Delapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004).

As the Second Perm Plan was substantially the same as the First Perm Plan, which was admitted without objection, we find no abuse of discretion in the admission of the Second Perm Plan. Additionally, we are unconvinced that either of the permanency plans qualifies as hearsay under Rule 801(c) of the Tennessee Rules of Evidence. While Mother refused to sign both of the permanency plans, they are similar to a contract, and as such were not offered to prove the truth of the matter asserted in them but rather solely to set out the terms of the plan itself. We find no error in the Juvenile Court's admission of the First Perm Plan or the Second Perm Plan.

We next address whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights for abandonment. In pertinent part, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2005). As pertinent to this issue, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child;….

Tenn. Code Ann. § 36-1-102 (1)(A) (2005).

-16-

With regard to this issue, the Juvenile Court found and held that clear and convincing evidence existed:

> that given [Mother's] lifestyle and conduct prior to her most recent incarceration, that she exhibited a wanton disregard for the welfare of her child, given the fact she's had nineteen prior incarcerations prior to the most recent one. Furthermore, that she had a drug addiction, which she has admitted to the psychological examiner, which is a wanton disregard for the welfare of her child, and she admitted that her mother was essentially taking care and raising her child.

The evidence does not preponderate against the Juvenile Court's findings that clear and convincing evidence existed to terminate Mother's parental rights under Tenn. Code Ann. § 36-1-113(g)(1).

Next, we address whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights for failure to substantially comply with the permanency plan. As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(2) provides that parental rights may be terminated upon clear and convincing evidence that: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4.…" Tenn. Code Ann. § 36-1-113(g)(2) (2005).

With regard to this issue, the Juvenile Court found and held that clear and convincing evidence existed that:

> the Department has met the clear and convincing burden of proof of the grounds for substantial noncompliance, by [Mother], with the responsibilities in the Permanency Plan. The Permanency [P]lan was adopted by this Court in September of 2006 and which [Mother] received a copy. Even though she refused to sign it on advice of counsel, she did receive a copy of it, knew that it required her to do certain things, and she failed to do those things. She was to complete an Alcohol and Drug Assessment and follow the recommendations. She was to complete a rehab program and participate in aftercare by attending AA or NA meetings. She didn't complete a rehab program and there's no evidence that she attended any AA or NA meetings. She did not, and there's been no testimony that she submitted to counseling at the Mental Health Center. There's been no testimony that she had resolved her legal issues, and actually after this Permanency Plan was put into effect she added to her legal issues with further incarcerations. I further find that under the Permanency Plan she [was] required to obtain and maintain employment. She was not able to do that. She was working for this Mr. Landers, but there has been no proof of what her actual pay was or pay stubs or bank account records. And further, she did not complete the parenting assessment, and she was out of jail for a period of five months, and during that time she only visited her child five times. And so there was really no effort being put forth by [Mother] to substantially comply with or even comply at all with the Permanency Plan, and the Court finds that there was ample evidence presented to prove that she substantially failed to comply with the Permanency Plan.

Mother argues, in part, that DCS failed to make reasonable efforts to assist her. As this Court stated in *State of Tennessee, Department of Children's Services v. S.M.D.*:

> The State "must make reasonable efforts to preserve a family before seeking to terminate parental rights." *In re: Jeremy D. and Nathan D.*, No. 01-A-01-9510-JV-00479, 1996 Tenn. App. LEXIS 292, at **7-8, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996), *no appl. perm. appeal filed*. However, "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re: R.C.V. and O.V.*, No. W2001-02102-COA-R3-JV, 2002 Tenn. App. LEXIS 811, at *39, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002), *no. appl. perm. appeal filed*.

*State of Tennessee, Department of Children's Services v. S.M.D.*, 200 S.W.3d 184, 197-98 (Tenn. Ct. App. 2006).

The evidence in the record on appeal shows that Mother failed to follow through with the recommendations of the psychological assessment, failed to attend AA or NA meetings, failed to obtain a job even though she had obtained employment in the past and clearly knew how to do so, failed to exercise the majority of the visitations offered to her, failed to keep in touch with DCS, and continued to engage in illegal activities. DCS was not required to carry the entire burden of attempting to reunite Mother with the Child, and it was hampered in this respect as Mother was incarcerated much of the time due to Mother's own illegal actions. The evidence shows that Mother made little effort to carry her portion of the burden toward reunification. Both case managers testified that Mother had not substantially complied with the permanency plan, and Mother admitted at trial that she had not really tried to complete the permanency plan stating:

> I thought my mama was going to get her back anyway. That's the whole reason I really didn't - - I mean, I did what I had to do but I didn't really try, try as hard as I could, because I thought Mama was getting her back. Mama told me she was getting her back. Mama had done everything she was supposed to get her back so I thought she was getting her back.

By order entered August 1, 2006, the Juvenile Court found that reasonable efforts were being made to prevent the Child's removal from the home. By order entered September 14, 2007, the Juvenile Court found that DCS had made reasonable efforts to reunite the Child with Mother. In its Order Terminating Parental Rights entered June 19, 2008, the Juvenile Court implicitly found that DCS made reasonable efforts to assist Mother. The evidence does not preponderate against these findings.

The evidence does not preponderate against the Juvenile Court's findings that clear and convincing evidence existed to terminate Mother's parental rights for failure to substantially comply with the permanency plan.

We next address whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Mother's parental rights on the ground of persistent conditions. In pertinent part, Tenn. Code Ann. § 36-1-113(g)(3) provides that parental rights may be terminated if clear and convincing evidence exists that:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminished the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2005).

With regard to this issue, the Juvenile Court found and held that clear and convincing evidence existed that:

At the time this child was removed by the Department of Children's Services, the grandmother, who was the custodian of the child at the time, was in jail. The mother…was in jail, and an aunt, who had just physical custody of the child, did not have legal custody, was arrested for a DUI forth offense. And so there was a valid basis for the child to be placed in the care and custody of the Department of Children's Services.

The conditions which led to that removal still exist, and there's been no evidence that they've been remedied, and given the fact that the mother is still in jail, there is little likelihood the conditions would be remedied at an early date. The Court believes, even upon her release in late June of 2008, that it would take [Mother] at least a year to work a Permanency Plan (and the Court believes she would not be successful) and that would just mean that the child would be in custody for another twelve months, which would put her at almost 32 months being in custody of foster care. And the Court finds that that's unreasonable and is not in the best interest of the child.

The Court also finds that the continuation of a parent/child relationship between [Mother] and [the Child] would greatly diminish the child's chances of early integration into a safe, stable and permanent home. Based upon the testimony of all those involved, the child's current placement is in her best interest. It is a stable and safe and permanent home, and the foster parents are willing to adopt. So the Court

finds that by clear and convincing evidence grounds exist for termination of [Mother's] rights based upon the persistent (sic) of conditions….

The evidence does not preponderate against the Juvenile Court's findings that clear and convincing evidence existed to terminate Mother's parental rights on the ground of persistent conditions.

Finally, we address whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated. The Juvenile Court found and held that clear and convincing evidence existed that:

it would not be safe at this time for the child to be returned to the mother or her home. The Court finds that the mother has failed to make an adjustment in her life, a lasting adjustment at this time to allow for reunification. The Court finds that a change at this time of the caretakers of this child would have a detrimental, emotional, psychological effect upon the child because she is attached to her foster parents. The Court has no doubt that this child loves her grandmother and loves her mother, but that the child has found a safe and stable home, and the Court believes that's in the child's best interest.

\* \* \*

Furthermore, the home where the child would be, if in the custody of the mother, is not an appropriate home. Based upon prior history, there's been criminal activity around the child when she's been in the custody of the mother, given her drug use and other problems that have led to her incarceration. So the Court finds that by clear and convincing evidence that it is in the best interest of the child that the parental rights of [Mother] be terminated.

Mother admitted at trial that throughout the Child's life, "my mama always had custody because I was in and out because I was on drugs and I couldn't, I was just, I was pretty much, I would go to my mom's to spend time with [the Child] and leave." Mother also stated at trial, "all I ask, is for visitation with [the Child]. I know I probably couldn't give her what they can give her. I know they can give her more, more than I can. The only thing I ask of the Court whatsoever is that I can get visitation with her." Mother's actions and words demonstrate that she wants her parental rights as to the Child, but no parental responsibilities.

The evidence does not preponderate against the Juvenile Court's findings that clear and convincing evidence existed that it was in the Child's best interest for Mother's parental rights to be terminated.

As grounds for termination were proven by clear and convincing evidence and clear and convincing evidence was presented that the termination of Mother's parental rights was in the best interest of the Child, we affirm the termination of Mother's parental rights to the Child.

-20-

## Conclusion

The judgment of the Juvenile Court terminating Mother's parental rights to the Child is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, V.N. and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE