IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 9, 2011

IN RE **FRIDRICH E.T.W.**

**Appeal from the Juvenile Court for Anderson County**
**No. J-27423      Brandon K. Fisher, Judge**

_____

**No. E2011-00884-COA-R3-PT-FILED-MARCH 21, 2012**

_____

George R.W., Jr. ("Father") appeals the termination of his parental rights with respect to his minor son, Fridrich E.T.W. (DOB: Aug. 27, 2008) ("the Child"). The Department of Children's Services ("DCS") had filed a petition seeking to terminate both parents' rights after the Child was taken into custody pursuant to an emergency protective order. He was subsequently adjudicated dependent and neglected as a result of being subjected to severe child abuse.[1] As to Father, DCS pursued termination on the sole ground of severe child abuse. Father did not appear at trial. At the start of the trial, his counsel moved for a continuance based in part on counsel's assertion that Father had advised her that he wished to effectuate a voluntary surrender of his parental rights. The trial court denied the motion and the hearing proceeded in Father's absence. The court terminated Father's rights based upon its finding that the sole ground for termination was established and that termination was in the best interest of the Child, both findings said by the court to be made by clear and convincing evidence. Father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Julie Anne Foster, Oak Ridge, Tennessee, for the appellant, George R.W., Jr.

_____

[1]The transcript reflects that Rachel K. ("Mother") voluntarily surrendered her rights at the start of the trial. As a result, DCS did not proceed with its allegations against her. Mother is not a party to this appeal and we refer to her only as is necessary to present the relevant underlying facts.

Robert E. Cooper, Jr., Attorney General and Reporter; Martha A. Campbell, Associate Deputy Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

No appearance by Guardian ad Litem.

## OPINION

### I.

Father and Mother were never married, but they did live together for some period of time. The Child, then six-months-old, came into the temporary custody of DCS on December 17, 2008, following a heated dispute between Father and Mother at their house in the presence of the Child and a half-sibling.[2] In its October 2009 adjudicatory order, the trial court summarized the underlying facts of the case as follows:

> A Petition for Temporary Custody of the subject children was filed . . . by DCS, alleging that the subject children were dependent and neglected based upon allegations that the Father had discharged a firearm at the Mother during an altercation over prescription medication and money . . . .
>
> *   *   *
>
> Based upon the allegations in the Petition, the Court found that there was probable cause that the subject children were dependent and neglected and that there was an imminent risk of harm to these children if left in their parents' custody . . . . Accordingly, a Protective Custody Order was signed on December 18, 2008, placing temporary custody of the subject children with [DCS]. Subsequent Orders modified the temporary custody, placing . . . [the Child] with his maternal grandparents. At a later hearing, [the Child] was again placed into the custody of DCS when his grandparents expressed, under oath, that they were unable to provide adequate care for the [C]hild.

---

[2]Father is not the father of the half-sibling and that child is not a subject of the petition in this case.

On March 25, 2009, an Amended Petition for Temporary Custody was filed by DCS, including allegations of severe abuse as to [Mother] and [Father].

At the final hearing . . . the Court heard from multiple witness[es], the most credible of which was [the Child's half-sister], who was 7 ½ at the time . . ., followed closely by [the family's outreach services worker].

While Father was able to provide some credible testimony . . . regarding [Mother's] drug history, he appeared to minimize the circumstances that brought him before the Court and any role he had in the allegations in the Petition.

\* \* \*

The Father had lawful prescriptions, but routinely sold them while the [C]hildren were home. Evidence was also presented that he had taken the [C]hildren with him when he would go to sell the pills.

On December 17, 200[8], the Father and Mother had a violent altercation when the Father confronted the Mother, accusing her of stealing his pain pills and his money during his recent incarceration. As the altercation escalated, the Father pulled out a loaded gun and aimed it at the Mother, confronting her about her addiction and drug use.

The four month old . . . [Child] was sleeping in his car seat in the same room in which the Father pointed a gun at the Mother's head.

The Father placed the gun to his own head at some point during the argument, before ultimately pulling the trigger, firing at the Mother's head.

The bullet missed the Mother, passing through the wall behind her into the room behind the living room, exiting the wall just above the baby bed or playpen in the [Child's] bedroom.

* * *

> [T]he police arrived shortly after the incident, and[,] . . . upon inspection of the house, found that the [Child] was within four feet of the gun. When questioned, the Father stated that he could have killed the Mother if he wanted to.
>
> The Father was arrested for aggravated assault and child endangerment as a result of the incident.

At the conclusion of the adjudicatory hearing, the court found, by clear and convincing evidence, that the Child was dependent and neglected and the victim of severe abuse by Father "in that [Father] exposed [the Child] to abuse or neglect likely to cause great bodily harm or death. . . ."

Father did not timely appeal the October 2009 adjudicatory order. In January 2011, he moved the court to vacate or modify the order as to its finding of severe abuse. In his motion, Father alleged that "[d]ue to illness, [his then-attorney] failed to inform [Father] of his right and opportunity to appeal the findings in the October 26, 2009 order. . . ." The court denied the motion as being untimely, it having been filed some 15 months after the challenged order was entered. Further, the court found, "there is no proof of [former counsel's] illness . . . that prevented [counsel] from adequately representing [Father]. . . ." DCS filed its petition to terminate Father's rights on October 15, 2010. As the sole ground for termination, the petition cited the finding of severe child abuse in the October 2009 order.

At the February 2011 termination hearing, Father's counsel was present, but Father did not appear. After denying the oral motion from his counsel for a continuance, the hearing proceeded in Father's absence. The court heard from two witnesses – the Child's DCS case manager, Heather Poster, and the Child's foster mother. At the time of trial, the Child was two and a half and had resided with the same foster parents for two years. Ms. Poster visited the Child at his foster home at least twice each month. Foster father worked, while foster mother stayed at home with the Child. In addition, foster mother cared for her young nieces every other week and the Child interacted and played well with them. According to Ms. Poster, the family seemed well-bonded, and the Child called the foster parents "mommy" and "daddy." During Ms. Poster's home visits, the Child constantly reached out for foster mother and was eager to engage foster mother in his activities.

Ms. Poster was aware that Father had seen the Child on court dates, but said he had not otherwise visited with him since the Child's removal in 2008. His failure to visit

-4-

continued even after protective orders prohibiting contact with the Child were no longer in place. Father had made some effort at setting up a visit with the Child during 2010, but missed the first scheduled visit and failed to follow through with scheduling another. Since then, Father had not called DCS to check on the Child's well-being. Ms. Poster was aware that Father received VA disability benefits and, although he told her that he was working, he did not identify his employer. She noted that DCS had worked with Father on the things he needed to do to secure reunification, but said Father made no progress on his responsibilities in the first year. Later, after DCS was relieved of making further reasonable efforts toward reunification, Father did complete a mental health assessment.

Ms. Poster believed that Father continued to present a risk to the Child because, in her view, he remained as "unstable" as he had been when his conduct lead to the Child's removal. Ms. Poster noted that DCS had "indicated" that Father had abused the Child's half-sister and Mother had reported to Ms. Poster that Father had been verbally abusive and threatening toward her. In addition, both parents had been arrested for selling controlled substances to an undercover officer at Father's alleged place of employment in June 2010.

The testimony further showed that the Child had lived with his foster parents since he came to their home when he was six-months-old. Ms. Poster had no concerns regarding the foster parents' home environment, their ability to raise the Child, or their financial situation. She noted that both foster parents had extended family nearby who had helped care for the Child and even attended team/family meetings at DCS. The Child was healthy but displayed some speech delays for which he was scheduled to begin speech therapy the month after trial.

At the conclusion of the hearing, the court found that a ground for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(4) was clearly and convincingly established in that "[Father] has been found to have committed severe child abuse as defined in [Tenn. Code Ann. §] 37-1-102 under a prior order of the court." Upon further finding, again by clear and convincing evidence, that termination was in the best interest of the Child, the court granted DCS's petition and permanently severed Father's parental rights.

Father timely filed a notice of appeal.

II.

Father presents the following issues for our review:

> 1. Did the trial court err in denying Father's motion to continue the termination hearing?

2. Did the trial court err in holding that it is within the discretion of DCS whether to accept a voluntary surrender of parental rights?

3. Did the trial court err in concluding that clear and convincing evidence exists to support the termination of Father's parental rights?

## III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and may be terminated upon proof of appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).

This Court has observed:

> In order to terminate a parent's rights to his or her child, the trial court must make two findings. The court first must find . . . by clear and convincing evidence, that one of the asserted grounds for termination has been established. *See* Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 1998). Once the court has made this

finding, the court additionally must find that termination of the parent's rights is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1998).

*In re C.W.W.*, 37 S.W.3d 467, 475-76, (Tenn. Ct. App. 2000). Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

## IV.

In his first two issues, Father challenges the trial court's denial of his counsel's request to continue the termination hearing and questions the authority of DCS to reject a voluntary surrender of parental rights. Because the motion to continue encompassed Father's purported desire to surrender his rights to the Child, we address these related issues together.

As we noted earlier in this opinion, Father did not appear at 9:00 a.m. on February 17, 2011, for the scheduled termination hearing, despite the fact that notice of the hearing date, place, and time, was filed and sent to his counsel some three months earlier. His counsel, however, was present at the hearing, and made an oral motion for a continuance on Father's behalf. While it is not a matter of record, Father suggests in his brief that his absence was based upon his confusion as to the time of the hearing. Father further suggests that when counsel called from the courthouse to speak with him, he advised her that he wished to appear to surrender his parental rights. Before this Court, Father asserts that "all of the conditions precedent for a successful voluntary surrender were in place," yet DCS and the trial court refused to allow the surrender to proceed.[3] Father concludes that "equity demands that [he] be given the opportunity to voluntarily surrender his rights."

In the termination order, the trial court addressed the motion to continue and the voluntary surrender issues, as follows:

---

[3]In his brief, Father explains that his "plan to voluntarily surrender his parental rights was significantly influenced by the presumed desire of the [C]hild to eventually have the ability to discover his multi-cultural heritage and . . . learn . . . the origin of his birth name."

-7-

As a preliminary matter, the Court notes that [Father] failed to appear for this hearing. [Father's] attorney, Julie Foster, made an oral motion to continue this hearing due to [Father's] absence and due to her representation that [Father] had communicated to her that he wished to surrender his parental rights.

Following oral argument by the parties on the oral motion to continue, the Court denied the motion in that [Father] had actual notice of the date, time, and location of this hearing and his failure to appear was willful. Further, in that pursuant to statute the Department must be willing to accept a parent's surrender of parental rights regarding a child in the Department's custody, and the Department having clearly stated that it would not accept such a surrender in this matter, [Father's] desire to surrender his parental rights was not a compelling reason to continue this hearing.

This court reviews a trial court's decision to deny a motion for continuance under an abuse of discretion standard of review. *State Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317(Tenn. Ct. App. 2008). "In order to show abuse of discretion, a party must show some prejudice or surprise which arises out of the trial court's failure to grant a continuance." *Barber & McMurry v. Top-Flite Development Corp.*, 720 S.W.2d 469, 471 (Tenn. Ct. App. 1986)(citing *Com'r of Dept. of Transp. v. Hall*, 635 S.W.2d 110 (Tenn. 1982)). Moreover, "[w]here adequate time for trial preparation and notice of trial date are furnished, the proper procedure is to file an affidavit showing lack of preparation and a 'strong excuse' for changing the trial date." *Id*. (citing *Levitt & Co. v. Kriger*, 6 Tenn. Ct. App. 323 (1927)).

As an initial matter, we observe that the trial transcript in this case does not include any part of the proceedings related to the motion to continue. As previously noted, there was no written motion filed. As a result, we are left to review this issue based on the limited facts as recited by the trial court in its final order, and the *unsupported* factual allegations contained in Father's brief. This Court has spoken to the constrained nature of our review under similar circumstances:

With regard to the trial court's factual findings, as a general rule, we presume they are correct but will overturn them if we find that the evidence preponderates against them. However, "[t]he burden is . . . on the appellant to provide the Court with a transcript of the evidence or a statement of the evidence from

which this Court can determine if the evidence does preponderate for or against the findings of the trial court."

In this case, Builder has provided the court with neither a transcript nor a statement of the evidence. His briefs make various factual assertions and fact-based arguments, but "the recitation of facts and argument contained in [appellate briefs] . . . [is] not evidence. . . . [and] [cannot] be considered in lieu of a verbatim transcript or statement of the evidence and proceedings."

Builder's failure to provide us with a record of the proceedings below severely limits our ability to review the issues he raises.

Because of the absence of a proper record, we are limited to addressing those issues which raise pure questions of law, as well as any issues challenging the trial judge's application of the law to the facts as stated by the judge himself in his memorandum opinions. See Baker v. Hancock County Election Commission, No. 15, 1987 WL 7717, at *1 (Tenn. Ct. App. E.S., filed March 12, 1987) ("No transcript or statement of the evidence was filed, but we will accept as accurate the findings of fact in the Trial Court's memorandum opinion").

*Gross v. McKenna*, No. E2005-02488-COA-R3-CV, 2007 WL 3171155, at *2-3 (Tenn. Ct. App., E.S., filed Oct. 30, 2007)(additional internal citations omitted). Applying these principles to the instant case, we are bound to accept as true the trial court's finding that Father, for whatever reason, willfully absented himself from the termination hearing.

The trial court further determined that Father's wish to voluntarily surrender his rights, as communicated by him to his attorney, does not constitute a valid reason for continuing the hearing. The trial court observed that, in its opposition to a continuance, DCS was adamant that it would not accept a voluntary surrender of rights from Father in this case. The question becomes, as Father frames it, whether DCS has "the absolute right and discretion to refuse to accept a voluntary surrender of parental rights by the parent[]." The trial court found it does. We agree.

Tenn. Code Ann. §36-1-111 sets forth the procedure by which a parent can effectuate the voluntary surrender of his or her parental rights. The statute provides that a surrender or parental consent may only be made or given to a prospective adoptive parent, DCS, or a

licenced child-placing agency. Tenn. Code Ann. § 36-1-111(c). Further, "[a]ll surrenders must be made in chambers before a judge of the chancery, circuit, or juvenile court except as provided herein, and the court shall advise the person or persons surrendering the child of the right of revocation of the surrender and time for the revocation and the procedure for such revocation."

With respect to a voluntary surrender, subsection (f) of Tenn. Code Ann. § 36-1-111 is particularly pertinent:

> The commissioner, or the commissioner's authorized representatives, or a licensed child-placing agency, through its authorized representatives, may accept the surrender of a child and they shall be vested with guardianship or partial guardianship of the child in accordance with the provisions of this section and § 36-1-102; provided, that *the department or any licensed child-placing agency may refuse to accept the surrender of any child.*

(Emphasis added). " 'Department' means [DCS] or any of its divisions or units." Tenn. Code Ann. § 36-1-102(18). Pursuant to the cited statute, DCS acted within its discretionary authority when it advised the court that it would not accept an offer of voluntary surrender by Father in this case, even had one been formally made. Under the facts presented, we cannot say that the trial court abused its discretion in declining to continue the hearing to afford Father the opportunity to surrender his rights. In our view, Father cannot demonstrate particular "surprise" or "prejudice" as a result of the denied request for a continuance. Father had months, if not years, to decide whether to surrender his rights and, by the trial court's findings, was well aware of the scheduled hearing but took no action to effectuate a voluntary surrender at or before the final hearing.

In summary, the evidence does not preponderate against the trial court's findings and there is no error in the challenged rulings. We reject Father's arguments to the contrary. The court did not abuse its discretion in holding the trial in Father's absence.

V.

As we have observed, "[a] person seeking to terminate parental rights must prove . . . that termination is in the child's best interest." *In re Arteria*, 326 S.W.3d 167, 175 (Tenn. Ct. App. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d at 546. In the present case, Father does not contest the finding of a ground for termination. In any event, our review of the record leads us to

-10-

conclude that the evidence does not preponderate against the trial court's finding that Father subjected the Child to severe child abuse. The October 2009 adjudicatory order clearly and convincingly, in fact indisputably, establishes this termination ground. Had Father challenged this ground, he would not have prevailed. Accordingly, we move to a consideration of the best interest of the Child, guided in our review by the non-exclusive list of factors set forth in Tenn. Code Ann. § 36-1-113(I).[4]

---

[4]The statutory factors include:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

(continued...)

Addressing the Child's best interest, Father contends in his brief that, on his own initiative, he completed many of the "action steps" outlined in the Child's initial permanency plans with the goal of regaining custody. He asserts that he secured stable housing and a legal source of income, worked toward resolving his legal issues, completed an alcohol and drug assessment, and has not engaged in further unlawful activity. Father essentially concludes that given the "efforts and changes" he has made since the Child's removal, termination cannot be shown to be in the Child's best interest. The problem with all of this is that there is no testimony in the record to support it. Given the lack of proof at trial, Father's assertions are simply that – unsupported assertions.

The trial court found that termination of Father's rights was clearly in the Child's best interest. The court observed:

> The Court finds that [Father] has not established any meaningful parental relationship with [the Child] in that [Father] has not had any visitation to speak of much less any visitation that would have established a parent/child bond that can even be severed.
>
> It appears the only parents this [C]hild has ever truly known have been [foster parents]. [Foster mother's] testimony has shown this Court she is prepared to act as the parent of this [C]hild and has been acting as the parent of the [C]hild and this is a permanent home that is appropriate and in the best interest of this [C]hild. And therefore, the best interest prong has been met. So the clear and convincing requirements have been met and the parental rights of [Father] are terminated.

In response, Father suggests that his lack of visitation and relationship with the Child are not properly attributed to him. He alleges that "DCS would have assumed such contact was not allowed and would have thwarted any such efforts."

First, there is nothing to indicate that DCS acted to thwart Father's visits with the Child once visitation was allowed. The record reflects that, as a result of the incident leading to the Child's removal, Father was arrested and incarcerated for a time. When he was released on probation, he was initially prohibited from visiting with the Child by a "no-contact" order. However, a December 2009 progress report from the case manager reflects that DCS scheduled a visit for Father in November 2009; Father received a written notice of

_____

[4](...continued)

the visit and also was sent a reminder letter several weeks in advance. Father failed to appear for the visit and never contacted DCS to schedule another one. The August 2010 revised permanency plan also reflects that Father was permitted supervised visits, to be initiated by him, but no such visits took place. We think Father's lack of contact and the resulting lack of a relationship with the Child are directly attributable only to him by virtue of both his actions and inaction regarding the Child.

Also contrary to Father's assertions, the evidence indicates that Father had made "no progress" toward his goals in the permanency plan for over a year, and this did not change until after DCS was relieved of making any further "reasonable efforts" to assist him. In addition, there was evidence that, as recently as July 2010, well over a year since the Child's removal, Father had continued his criminal behavior when he was arrested (along with Mother) for selling drugs to an undercover officer at his place of employment.

The proof shows that, despite his rough start in life, the Child is now living in a safe, comfortable environment and is well-cared for by his foster parents. The Child knows them as "mommy" and "daddy" and foster mother said that they loved the Child and intended to continue caring for him as if he were their blood son. Notably, just days before the hearing, the Child was joined at home by his eight-week-old biological brother whom the foster parents have also taken in. According to foster mother, she and her husband, who had no children of their own, planned to adopt the Child "[j]ust as soon as it can be done."

In summary, the evidence preponderates overwhelmingly in support of the trial court's findings and ultimate conclusion. In short, termination of Father's parental rights and a chance at permanence with the only "parents" he had truly known were clearly and convincingly shown to be in the best interest of the Child.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, George R.W., Jr. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE