IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 13, 2014

**IN RE S.H. ET AL.**

**Appeal from the Juvenile Court for Bradley County**
**No. J-10-479      Kurt Benson, Judge**

**No. E2013-02007-COA-R3-PT-FILED-APRIL 29, 2014**

V.H. ("Mother") appeals the order terminating her parental rights to her four minor children, S.H., R.L.R. III., M.B and K.C.B. ("Children").[1]  The Children were placed in the temporary custody of the Department of Children's Services ("DCS") based on allegations of lack of supervision, physical abuse, and Mother's drug use.  The Children were subsequently adjudicated as being dependent and neglected.  After a trial, the court found that there was clear and convincing evidence to establish the existence of multiple grounds for termination and that termination was in the best interest of the Children. Mother appeals. She challenges the court's denial of her motion to continue the trial and its best interest determination.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and  JOHN W. MCCLARTY, JJ., joined.

Arthur Bass, Cleveland, Tennessee, for the appellant, V.H.

Robert E. Cooper, Jr., Attorney General and Reporter, and Leslie Curry, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]In earlier proceedings, the parental rights of each child's father were also terminated. R.C.S. is the father of S.H;  R.L.R., Jr., is the father of R.L.R. III.; and K.B. is the father of K.C.B. and M.B.  None of the fathers is a party in this appeal.   We refer to them only as necessary to recite the underlying facts relevant to Mother's appeal.

# OPINION

## I.

In 2010, Mother and three children lived with K.B. At the time, Mother was pregnant with K.C.B. On December 2, 2010, DCS received a referral alleging that children in the home were being physically abused. On visiting the home, an investigator found R.L.R. III with a burn to his wrist, a bruised cheek, and super glue in one eye. After the visit, DCS offered Mother assistance in an effort to prevent the Children's removal. On December 3, 2010, all three children were removed to a 48-hour protective custody based on lack of supervision and Mother's and K.B.'s drug use. Just prior to the removal, Mother expressed that she was in need of mental health assistance, but she refused to cooperate with DCS's efforts to develop a safety plan for the Children. Days later, both Mother and K.B. failed drug tests. Mother tested positive for methamphetamine, but denied that she had used the drug. She admitted, however, to a drug-related arrest a year earlier and to there being a "meth lab" behind the seat in a car that belonged to K.B. On December 6, 2010, DCS held a Child and Family Team Meeting and further explored possible "relative" placement options for the Children. As a result, M.B. was placed with her paternal grandparents, while the other children remained in DCS custody. On January 20, 2011, DCS developed an initial permanency plan with a stated goal of returning the Children to a parent. Mother signed her agreement to the initial plan. She also signed the criteria for termination of parental rights.

On April 27, 2011, the youngest child, K.C.B.,was born. At the time of his birth, Mother again tested positive for methamphetamine use. The infant followed his siblings into DCS custody on May 4, 2011. The Children's cases were consolidated for an adjudicatory hearing. At the August 4, 2011, hearing, the trial court found that DCS had clearly and convincingly proven its case. Mother stipulated to the court's adjudication that the Children were dependent and neglected in her care.

Ultimately, all four children were placed in foster care homes. In January 2013, M.B. had joined her siblings in DCS custody after testing revealed she was exposed to amphetamine and methamphetamine while she, along with her father, K.B., were living in her paternal grandparents' home. She was placed in foster care that same month. In February 2013, the Children's permanency plan was revised to add K.C.B. The time for Mother to complete the plan's goals was extended. A concurrent goal of adoption was added.

Mother had unsupervised visits with the Children in early 2011. They ceased after it was alleged that she hit R.L.R. III., who was deaf and suffered from attention deficit hyperactivity disorder. Beginning in February 2011, Mother was permitted supervised visits.

On December 6, 2011, the trial court suspended Mother's right to visit the Children as a result of Mother's misconduct during earlier, supervised visitations. After the order was entered, Mother never sought reinstatement of her visitation rights. Mother was not employed after she lost custody of the Children. She last paid any support in January 2011.

On August 29, 2012, DCS filed a petition to terminate Mother's rights to the three children, S.H., R.L.R. III, and K.C.B. On May 20, 2013, a second petition to terminate was filed, this time with respect to M.B. On June 14, 2013, a bench trial was held on the consolidated petitions. The Children then ranged in age from 2 to 7, and were living in three separate foster homes.[2] Mother participated in the hearing from jail. She had been incarcerated for the past 15 months, most recently in Walker County, Georgia. It had been a year and half since she last saw the Children.

The proof showed that Mother had not made substantial progress toward achieving the steps necessary to regain custody of the Children in the two and a half years since the oldest three were removed. Most notably, Mother's involvement with drugs continued, at least until she was incarcerated. She was arrested on drug-related charges in Hamilton County in 2011 and in Bradley County in 2012, for which she was convicted pursuant to her guilty pleas for child abuse and two counts of intent to manufacture methamphetamine. Mother testified she was introduced to methamphetamine by the fathers of her children. She considered her involvement with drugs her "worst mistake." Days before the termination trial, Mother was transferred from Tennessee to jail in Georgia. A bench warrant was issued as result of her failure to appear on charges of aggravated assault, public intoxication, and eluding arrest stemming from a 2012 altercation with another woman.

After her release from jail, Mother planned to work in Chattanooga as a housekeeper for an elderly friend and for an uncle. Mother testified that in jail she had become "clean and sober" and was ready to be a "good mother" to the Children. She produced certificates reflecting that, in jail, she had completed GED courses and participated in various other classes covering emotional health, alcohol and drug education, personal finance, and anger management. Mother said she was bipolar and had attention deficit disorder.

DCS family social worker David Griffith was assigned the Children's case upon their entering state custody. His assessment was that, two and a half years after the Children's removal, Mother was no closer to regaining custody than she had been on day one. Mother was incarcerated much of that time and was never able to show that she could provide a stable home for the Children. Griffith felt termination was appropriate because, in addition

---

[2]Half-siblings K.C.B. and S.H. were placed together.

to Mother's incarcerations and drug history, she had little contact or relationship with the Children. He was confident that DCS could find adoptive homes for all of the Children and believed termination was best for them.

After the trial, the court terminated Mother's rights to the Children on the grounds of abandonment by non-support and wanton disregard; substantial non-compliance with a permanency plan; and persistence of the conditions that led to the Children's removal. *See* Tenn. Code Ann. § 36-1-113(Supp. 2013). The court further concluded that termination is in the best interest of the Children. Mother filed a timely notice of appeal.

## II.

Mother presents the following issues for our review:

> 1. Did the refusal of the trial court to grant a continuance to allow [Mother] to be present at the final hearing on termination constitute an abuse of discretion?

> 2. Was the termination of the parental rights of [Mother] in the best interest of the [C]hildren?

## III.

With respect to parental termination cases, this Court has stated the familiar standard of review as follows:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness

-4-

of the conclusions drawn from the evidence. *In re Angelica S.*, E2011–00517–COA–R3–PT, 2011 WL 4553233 at \*11–12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

*In re E.K.*, No. E2013-01776-COA-R3-PT, 2014 WL 295837 at \*3 (Tenn. Ct. App. E.S., filed Jan. 28, 2014).

IV.

As a preliminary matter, Mother asserts that the trial court abused its discretion in denying her request to continue the termination hearing to a later date when she could appear in person. She acknowledges that she was represented by counsel and personally participated by telephone but submits that, even so, she was denied her "full due process rights."

"The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *State Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008)(quoting *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997)).

A termination hearing as to Mother and all three fathers was initially set for May 2013. At that time, the court terminated each father's parental rights.[3] With respect to Mother, the court continued the termination hearing. Ultimately, trial was held on the

---

[3]At the May hearing, K.B. voluntarily surrendered his rights to his child, K.C.B. The petition to terminate his rights to his child, M.B. was heard separately.

consolidated petitions to terminate Mother's rights to all four children on June 14, 2013. As we earlier noted, Mother was then in jail in Walker County, Georgia, having been transferred from Hamilton County earlier that same week. She testified she had not yet been to court in Georgia, but was hopeful she would be released within a month. At the outset, Mother's attorney, Mr. Bass, objected to the plan to allow Mother to participate by telephone and orally moved for a continuance. Counsel asserted that Mother would not be able to review documents, confront or judge the demeanor of other witnesses, or consult with him during the hearing. Counsel further stated:

> [I]t's my understanding that she has received at least from now forward probation on the charges in Hamilton County and in Bradley County. She is now, to my understanding, in Walker County in jail facing charges there. If that is correct, she would soon be available to physically appear in this court once she is released. . . . This did come up sort of last minute for her to be transferred to Walker County. We had originally arranged for her to be physically transported here to be present in court from Hamilton County, and it was only a few days ago she was sent to Walker County instead.

In concluding, counsel asserted that Mother was "not in Georgia by choice." Rather, he argued, she waived extradition in an effort to have her pending criminal charges in Georgia quickly disposed of and she was hopeful that she would receive probation in the process.

In response, DCS counsel stated:

> I would point out that [Mother] voluntarily waived extradition and went to Georgia of her own free will and choice. She did not have to do that. We had an order of transport down. She would have been here physically present today had she not signed a waiver . . . and gone to Georgia. We have established a phone link up so that she can participate by phone, which is the best way she can participate in these proceedings, but she's in Georgia because she wanted to go to Georgia. If she wanted to be here, the mechanism was already in place . . . .

For his part, Mr. Wilton A. Marble, Jr., the guardian ad litem, took the position that "this has dragged on long enough" as the Children had been in DCS custody for nearly three years. Mr. Marble urged that Mother could effectively participate via telephone. Counsel further noted that he had participated in several termination hearings "where the clients have

participated via phone, and the statute has allowed it in the interest of these children. . . ." Mr. Marble, together with the intervening petitioners, urged the court to proceed "so we can get some permanence" for the Children.[4]

Following argument of counsel, the court declined to continue the hearing. The Court stated:

> [M]y opinion is that she did . . . voluntarily waive extradition, and that while she's not here, that was not compelled upon her. I agree with the guardian ad litem, that this matter has gone on long enough, and we need to resolve this case one way or the other. . . . So my position is that we go forward this morning with our hearing.
>
> *     *     *
>
> [Mr. Bass] would have access certainly to talk with his client by phone, and that may be after every witness that is called testifies.

Thereafter, the court directed the central placement of the telephone and instructed counsel to conduct their examination directly in front of the bench. Further, counsel for Mother advised her to interrupt if she was unable to hear at any point in the proceeding. The record reflects that Mother directly responded to questioning that took up some 12 pages of the transcript before she first indicated that she could not hear a comment by the guardian ad litem following one of the times that Mother "pled the Fifth" during her testimony. Counsel's comment was explained, the questioning continued, and Mother immediately gave her responses.

Throughout Mother's testimony, a few questions were repeated once, then answered without further difficulty. At one point, the guardian ad litem questioned Mother about her completion of an alcohol and drug assessment. Counsel stated: "And I see in the petition that you did that in January of 2011; is that correct?" Mother replied, "I cannot see the petitions,"

---

[4]The context of the discussion indicates that counsel was referring to Tenn. Code Ann. § 36-1-113(f)(3) which provides that "the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances."

and added that she was "getting in trouble" at the jail for speaking too loudly. Counsel advised Mother that he could hear her "perfectly." Counsel repeated the question and Mother's testimony continued without interruption. As each of the other two witnesses testified, the court paused and expressly asked Mother whether she wished to confer with her attorney regarding their testimony. At the close of the hearing, Mother was offered and took the opportunity to add anything further that she wanted the court to consider.

In the context of a parental termination hearing, this Court has observed that "due process requires the trial court to provide the prisoner defendant with meaningful access to the court and an opportunity to be heard." *In re Tiphani H*., No. E2010-02112-COA-R3-PT, 2011 WL 4597551 at *6 (Tenn. Ct. App. E.S., filed Oct. 6, 2011)(quoting *In re Perry*, No. W2000-00209-COA-R3-CV, 2001 WL 277988 at *5 (Tenn. Ct. App. W.S., filed Mar. 12, 2001)). "Incarcerated parents, however, 'have no absolute right to be in attendance at the hearing of a civil matter.' " *Id*. (quoting *State v. Moss*, No. 01A01-9708-JV-00424, 1998 WL 122716 at *5 (Tenn. Ct. App. M.S., filed Mar. 20, 1998)). "[T]he decision to permit a prisoner to physically appear in court to defend a civil proceeding is within the sound discretion of the trial court." *Id*. (citing *Moss*, at *4).

In the present case, Mother has failed to demonstrate that due process was not afforded her, either by requiring her to participate in the termination hearing by telephone or in the manner in which such hearing was conducted. Our review of the record leads us to reject Mother's bald assertion that she was denied her "full due process rights" as a result of the court's refusal to delay the hearing so that she could appear in person at some later date. "To clarify, an incarcerated parent has the right to 'participate' in a termination hearing. An incarcerated parent does not, however, have an absolute right to 'appear' at a termination hearing." *Id*. Given Mother's decision to waive extradition days before she was set to appear in court, the court took the only logical alternative that would allow Mother's rights to be preserved while also working to achieve permanency for the Children without further delay.

Mother has failed to establish that she was unable to fully participate in the termination hearing or that she was in any way prejudiced in participating by telephone rather than in person. Accordingly, we conclude that the trial court did not abuse its discretion in denying Mother's motion for a continuance.

V.

Before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven – "not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn.

2002)(citing Tenn. Code Ann. § 36-1-113(c)).  In the case at bar, Mother challenges only the best-interest determination, and not the grounds found to support the termination order. Nevertheless, we have reviewed the evidence with respect to each of the recited grounds for termination. We hold that the evidence does not preponderate against the trial court's finding that there was clear and convincing evidence establishing multiple grounds for termination. *See **In re Arteria H**.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010).

In considering the issue of what is in a child's "best interest," the courts are guided by the statutory factors set forth in Tenn. Code Ann. § 36-1-113(i).  That section provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This Court has observed that "[t]he above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." ***State Dep't of Children's Servs. v. B.J.N.***, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing ***Dep't of Children's Servs. v. P.M.T.***, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App. E.S., filed Sept. 15, 2006)).

In the present case, the trial court stated, in relevant part:

It is in the best interest of the [C]hildren . . . for the parental rights of [Mother] to be terminated, as [Mother] has failed to make an adjustment of her criminal behavior[.] [H]er repeated methamphetamine use and her exposure of children to such manufacture are actions that prevent her from making it safe for [the Children] to be placed back into her care. Further, her failure to effect any change, much less any lasting change, after reasonable efforts by [DCS] over the course of three (3) years while the [C]hildren have been in State's custody, demonstrates that a lasting adjustment does not reasonabl[y] appear possible.

[A]ny visitation prior to December 6, 2011, was only token in nature, disruptive, and not made in an effort to affect a meaningful, long-term relationship with her children. Further, [Mother] . . . had her children living with [K.B.] during his

-10-

methamphetamine use and manufacture and . . . after the children were removed for such methamphetamine exposure[,] she willingly and knowingly subjected other children to at least one . . . individual [Mother] knew to be making methamphetamine in a home while said children were present. As a result of such behavior, [Mother] pled guilty to manufacturing methamphetamine and child abuse. Further, as she is incarcerated, her physical environment is not healthy, safe or conducive to the [C]hildren returning to her custody at this time. [Mother's] mental condition at the time of the first removal of her three (3) oldest children . . . was a safety risk and hazard to her children, by her own admission. To date, no indication has been given as to whether she has specifically addressed her mental health needs . . . to be able to effectively provide safe and stable care and supervision for her children. Further, . . . despite her testimony that she is capable of working, she has failed to pay support . . . for the majority of the time her children have been in State's custody.

[Mother] . . . has failed to make changes in her conduct [for the] [C]hildren to be returned home. [S]he has continued to use methamphetamine and incur . . . drug-related offenses. She does not have a meaningful relationship with the [C]hildren. Moreover, she fails to acknowledge her role in the [C]hildren's placement into foster care and continues to downplay her drug use. She cannot provide a home for the [C]hildren and . . . all [are] placed in pre-adoptive homes and have developed a strong bond with their foster parents.

The proof does not preponderate against the trial court's findings and there is little we can add to its analysis. The trial court accurately stated the evidence and, on considering it in light of the relevant factors, concluded that none of them weighed in favor of Mother and against severing her ties to the Children. We agree. For her part, Mother submits that "even if certain grounds for termination were proven, her inability to work her permanency plan and prove her parenting abilities was primarily the result of her incarceration." She emphasizes that even though she was incarcerated, she "took steps to improve herself and her life and to do all that she could to make herself ready to get her children back upon her release."

Certainly, the educational and self-improvement courses Mother completed while in jail should be viewed as steps in the right direction. At the same time, when considering what is best for the Children, Mother's limited progress was essentially "too little, too late." A court must consider the question of a child's best interest from the perspective of the child rather than the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Notably, three of the children in the present case were removed in December 2010. From that time, until she was jailed in April 2012, Mother made no discernable efforts or progress at doing any of the things necessary to show that she could properly parent and provide for the Children. Instead, her actions indicate that her drug problems and other personal issues remained at the forefront of her life, while the Children's needs took a back seat.

As properly viewed from the Children's perspective, the evidence clearly and convincingly establishes that it is in their best interest for Mother's parental rights to be terminated. We therefore uphold the termination order.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, V.H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE