# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
February 21, 2018 Session

## IN RE D.T. ET AL.

**Appeal from the Chancery Court for Loudon County**
**No. 12338    Frank V. Williams, III, Judge**

_____

## No. E2017-00051-COA-R3-PT

_____

In this termination of parental rights case, P.T. and K.T., great aunt and uncle of the child at issue in this case, filed a petition to terminate the rights of N.D. (mother) with respect to her child, D.T. Mother did not appear for trial. She had previously filed a second request for a continuance, which the trial court had denied. At trial, P.T. and K.T. alleged the following grounds for termination: (1) four independent conditions or occurrences constituting severe child abuse; (2) mental incompetence; (3) two separate instances of abandonment by failure to support; (4) two separate instances of abandonment by failure to visit; and (5) failure to assume by act or omission, legal/physical custody or financial responsibility of the child. The court found clear and convincing evidence of all ten grounds. By the same quantum of proof, the court also found that termination is in the child's best interest. Mother appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Mark Foster, Madisonville, Kentucky, for the appellant, N.D.

Sharon Dawn Coppock, Strawberry Plains, Tennessee, for the appellees, P.T. and K.T.

-1-

# OPINION

## I.

Mother's rearing of her children has resulted in abuse, neglect, inconsistent housing, and no fewer than nineteen encounters with child protective services. Mother herself had a childhood characterized by abuse. She reported a significant history of sexual abuse by her father and brother. As an adult, mother has experienced physical and emotional abuse by partners. Mother has a history of mental illness. She has been diagnosed with post-traumatic stress disorder, depression, anxiety, and borderline personality disorder. Furthermore, she suffers from ongoing issues with severe alcohol and drug abuse. Mother admitted to using prescription narcotics while pregnant with the child. She has a criminal record as a result of her lifestyle.

On January 7, 2013, mother was incarcerated, in Shakopee, Minnesota. She was there due to a violation of probation resulting from earlier drug crimes and for domestic assault by strangulation of the child's older half-sister (H.D.). Mother gave birth to the child, on March 26, 2013, while incarcerated. Mother acknowledged her unavailability to care for the child due to her incarceration. On April 1, 2013, mother signed a "delegation of powers by parent form" giving the child to his paternal grandmother.

On June 10, 2013, mother signed another delegation of powers form giving the child to his maternal grandfather. He was the individual who mother had accused of sexually assaulting her throughout her life. In October 2013, the Minnesota Department of Human Services removed the child from the maternal grandfather. The child was then placed in the custody of the State of Minnesota.

On February 15, 2014, Minnesota placed the child in the physical custody of P.T. and K.T., who, as previously mentioned in this opinion, are the child's maternal great aunt and uncle. On February 20, 2015, the court entered an order placing the permanent and legal custody of the child with P.T. and K.T., who then resided in Tennessee. The Minnesota court limited the child's contact with mother. P.T. and K.T. received legal custody of the child, on May 22, 2015. On July 31, 2015, they filed their petition for termination of parental rights and adoption with respect to child and also his half-sibling sister (D.B.). Mother responded to the termination petition, expressing her desire to contest the termination of her rights. Mother was released from prison, on December 21, 2015.

On March 2, 2016, P.T. and K.T. filed a voluntary dismissal of their petition with respect to half-sister D.B. The record reflects that D.B. informed her therapist and guardian ad litem that she no longer wanted to be adopted. D.B. sought to return to

Minnesota. An order to conclude P.T. and K.T.s' custody of D.B. was entered, on March 4, 2016.

Trial involving parental rights was originally set for April 26-27, 2016 with respect to the child. Mother moved for a continuance as a result of the mother's alleged inability to travel to Tennessee due to a parole violation. An order was entered by the court granting the continuance. A December 5-6, 2016 trial date was set at a docket sounding on August 19, 2016. The selected dates were pre-approved by all counsel, and all counsel were promptly notified of the trial dates.

On October 11, 2016, during proceedings involving a motion to compel discovery, the following exchange occurred:

> Ms. Coppock [attorney for P.T. and K.T.]: …Then finally if [mother] doesn't petition for permission to travel, her parole officer won't let her travel and we filed a letter from her parole officer at the last hearing saying that was why she wasn't here last time was because she was both in trouble and she didn't ask in time.
>
> So for all of those reasons, I wanted to at least state on the record and advise [mother's attorney] and get input from you if you think I'm on the wrong track. If she's not here, we will seek a default judgment. She's not incarcerated. She doesn't have a right to participate by phone and her parole officer says if she stays in compliance and petitions in time that she can, in fact, travel.
>
> So for those reasons, we would -- I need her here because I have a lot of documents to show her. It's largely a documents case and to do that over the telephone is too great a hardship to our case and she's not entitled. This is her child and if she wants him, she needs to appear.
>
> The [trial] Court: Okay. What do you say?
>
> Ms. Jarret [D.T.'s guardian ad litem]: Your honor, I completely agree. I'm Amanda Jarret. I'm the guardian ad litem and I do agree that we need this information and I support the argument that has been made by Ms. Coppock.

Mother filed a second motion to continue on November 30, 2016. The motion was heard by the trial court, on December 1, 2016, by teleconference. The trial court denied

the second motion to continue, and in its subsequent order summarized its reasoning as follows:

>…Respondent's interrogatories indicate sufficient discretionary income to accumulate funds for travel to Tennessee with less advance notice than Respondent actually had and even if the income from a few days work were lost to illness.

>Petitioners and the Guardian ad Litem also expressed doubt Respondent was in good standing with her parole officer or that the officer had approved a travel request, but counsel had so far been unable to obtain information from the parole officer on those points.

>In their written response, Petitioners raised T.C.A. § 36-1-113(k) requiring that a hearing take place within six months of the filing of a termination of parental rights action unless the court determines that an extension is in the best interest of the child. The petition was filed on July 31, 2015, sixteen (16) months before the December 2016 trial setting. At a discovery motion hearing on October 11, 2016, Petitioners' counsel anticipating a claimed travel problem, reminded Respondent's counsel on the record of the requirement for parole compliance and advanced approval for Respondent to travel out of the State of Minnesota.

>This Court, seeing no reasonable expectation that the passage of time would improve the Respondent's ability to travel to Tennessee for a trial and no benefit to the child by delay, denied Respondent's motion to continue this case. At that time, the Court expressed hope that the Respondent would resolve her travel difficulties in time to attend the trial and told the Respondent's counsel that should proof arise proving that Respondent was impeded from travel through no fault of her own, the Court would reconsider the ruling. An order was not prepared by the time of trial.

>The motion was then verbally renewed immediately before the trial began on December 5, 2016. No proof that Respondent was impeded through no fault of her own was offered. Instead the parties agreed and some exhibits were offered demonstrating that the Respondent did not have travel

permission from her parole officer to travel. Further, it was proven that Respondent was again noncompliant with the terms of her parole due to consuming alcohol on November 13, 2016. Further, the Guardian ad Litem and Respondent's counsel agreed that the parole officer had told them by phone and email that despite the violation of the terms of her parole, a travel request would have been entertained in the event of a death in the family or for an appearance in court and that the Respondent had not applied for permission to travel…

The trial proceeded without mother's presence. On December 7, 2016, the trial court entered its final judgment terminating mother's parental rights. The court found that there was clear and convincing evidence for that result. By the same amount of proof, the trial court found that termination is in the child's best interest. The trial court further adjudged that the matter may be scheduled for immediate hearing on P.T. and K.T.'s adoption petition. Mother appeals.

## II.

As taken from her briefs, and slightly restated, mother raises the following issues on appeal:

> Whether the trial court erred when it denied mother's second motion for continuance of the trial, which prevented Mother from being able to participate in the trial.

> Whether the trial court erred when it proceeded with trial in mother's absence without offering mother the option to participate by telephone.

> Whether the trial court erred by finding clear and convincing evidence that it was in the child's best interest to terminate mother's parental rights.

P.T. and K.T. raise the following additional issues on appeal, as taken verbatim from their brief:

> What is the impact of Appellant's failure to strictly comply with T.C.A. § 36-1-124, which requires that a Notice of Appeal in a termination of parental rights case be signed by the Appellant?

The review, pursuant to *In re Carrington H.*, of whether each ground for termination of parental rights found at trial is supported by clear and convincing evidence.

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether

-6-

termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.")

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

P.T. and K.T. ask this Court to consider the impact of mother's alleged failure to strictly comply with Tenn. Code Ann. § 36–1–124(d) by not personally signing the initial notice of appeal. Our Supreme Court took up this issue in *In re Bentley D.* The High Court held that "the signature requirement of Tennessee Code Annotated section 36-1-124(d) does not require a notice of appeal to be signed personally by the appellant" and that a notice of appeal signed by the appellant's attorney satisfied the signature requirement of T.C.A. § 36–1–124(d). *In re Bentley D.*, 537 S.W.3d 907, 915 (Tenn. 2017). Therefore, based upon the foregoing, the signature of mother's counsel on the initial notice of appeal complied with Tenn. Code Ann. § 36–1–124(d) as a matter of law.

# V.

## A.

We address next whether the trial court erred when it denied a continuance of the trial, which prevented mother from being able to participate in the trial. "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." **Blake v. Plus Mark, Inc.,** 952 S.W.2d 413, 415 (Tenn.1997) (citations omitted); **State Dep't of Children's Servs. v. V.N.**, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008).

As pertinent to this issue, Tenn. Code Ann. § 36–1–124 provides:

> (a) In all cases where the termination of parental rights or adoption of a child is contested by any person or agency, the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.
>
> *     *     *
>
> (c) It is the intent of the general assembly that the permanency of the placement of a child who is the subject of a termination of parental rights proceeding or an adoption proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties, but that the rights of the child to permanency at the earliest possible date be given priority over all other civil litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36–1–124 (2005).

The trial court determined that mother had ample notice of the trial date. The court opined that she was well aware of the purpose of the proceedings. Other than her own shortcomings, the record indicates nothing that would have prevented mother from attending trial. Mother had sufficient income and notice to effectuate any travel plans. Mother's parole officer in Minnesota would have entertained a travel request had one been requested. The trial court doubted mother would have appeared at trial if another continuance had been granted.

Given our Legislature's clear directive to expedite contested parental termination proceedings, the fact that the trial court granted mother an initial continuance for nearly eight months, and mother's proven financial capacity to accrue funds sufficient for travel to Tennessee, we are unable to conclude that the trial court abused its discretion when it denied mother's motion for a second continuance.

**B.**

Mother asks this Court to also consider whether the trial court abused its discretion when it failed to offer her the option of participating by telephone, alleging that her due process rights to meaningfully participate at trial were infringed. Significantly, mother's counsel did not request that mother participate at trial by telephone.

There can be no question that a proceeding to terminate one's parental rights implicates the fundamental right of parents to the care, custody, and control of their children such that due process protections apply. "In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures[] in termination proceedings." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). The trial court balanced this right with the intent of the general assembly that the proceeding not be delayed any longer than is absolutely necessary consistent with the rights of all parties. We note that "admissibility or exclusion of evidence rests within the sound discretion of the trial court which should be reversed only for abuse of that discretion." *Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984).

Our Supreme Court has noted that "Tennessee law permits testimony by telephone in only a handful of narrowly drawn circumstances." *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014). In *Kelly*, the Court delineated examples of circumstances when telephonic testimony is allowed by statute as follows:

> Tenn. Code Ann. § 24–7–121(d) (2000) (permitting telephonic testimony regarding payment records in child support cases); Tenn. Code Ann. § 348–106(b) (Supp.2013) (permitting witnesses located in other states to testify by telephone in conservatorship or guardianship proceedings); Tenn. Code Ann. § 36–1–113(f)(3) (2010 & Supp.2013) (permitting an incarcerated parent or guardian to participate by telephone in a hearing to terminate parental rights); Tenn. Code Ann. § 36–5–2316(f) (2010) (permitting a witness located in another state to testify by telephone in cases under the Uniform Interstate Family Support Act); Tenn. Code Ann. § 36–6–214(b) (2010) (permitting a witness located in another state to testify by telephone in cases under the Uniform Child Custody Jurisdiction and Enforcement Act).

*Id.* at 693 n.1.

As our Supreme Court further explained in ***Kelly***, testimony in civil cases is generally governed by Tenn. R. Civ. P. 43.01, which states:

> In all actions at law or equity, the testimony of witnesses shall be taken pursuant to the Tennessee Rules of Evidence. Also, for good cause shown in compelling circumstances and with appropriate safeguards, the court may permit presentation of testimony in open court by contemporaneous audio-visual transmission from a different location.

> In addition to live testimony, this rule contemplates the use of contemporaneous audio-visual *(but not audio only)* transmissions. And even then, good cause, compelling circumstances, and adequate safeguards must be established before testimony by video conferencing may be allowed. *See* Tenn. R. Civ. P. 43.01 Advisory Comm. Cmt.

*Id.* at 693–94 (italics in original).

In ***Kelly***, our Supreme Court noted several reasons why live, in-person testimony is more desirable than remote testimony:

> (1) assists the trier of fact in evaluating the witness's credibility by allowing his or her demeanor to be observed first-hand; (2) helps establish the identity of the witness; (3) impresses upon the witness the seriousness of the occasion; (4) assures that the witness is not being coached or influenced during testimony; (5) assures that the witness is not referring to documents improperly; and (6) in cases where required, provides for the right of confrontation of witnesses. ***Bonamarte v. Bonamarte***, 263 Mont. 170, 866 P.2d 1132, 1134 (1994); *see also* Michael J. Webber, *Permissibility of Testimony by Telephone in State Trial,* 85 A.L.R. 4th 476 (1991).

*Id.* at 694.

Accordingly, counsel for P.T. and K.T. impressed upon the trial court the importance of mother's in-person testimony at trial. Counsel emphasized that mother's physical

presence was necessary due to the document-heavy nature of the then pending matter. The child's guardian ad litem agreed.

Mother asks this Court to consider her as having been effectively incarcerated due to her status as a parolee; we decline to do so. Mother was not incarcerated at the time of trial. Mother's parole officer informed counsel by both phone and email that, despite mother's violation of the terms of her parole, a travel request would have been entertained for an appearance in court, however mother had not applied for permission to travel. As discussed above, mother had already been granted a continuance from her original trial date several months prior. Mother had ample notice of her court date to appear in person.

Based upon the foregoing, we hold that mother was provided fundamentally fair procedures, and that the trial court did not abuse its discretion in declining to hold that the mother was unable to travel to Tennessee due to no fault of her own and by not inviting mother to participate in trial by telephonic means.

## VI.

### A.

P.T. and K.T. alleged four independent conditions or occurrences that constitute grounds for termination of mother's parental rights based upon Tenn. Code Ann. § 36-1-113(g)(4) and her having committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102. Tenn. Code Ann. § 36-1-113(g)(4) allows for termination of parental rights when:

> [t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tenn. Code Ann. § 37-1-102(b)(22) defines severe child abuse as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

-11-

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d)

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct.

Tenn. Code Ann. § 39-15-402(d) provides the following:

"Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

P.T. and K.T. alleged in their petition that the child:

was chemically exposed in utero by the mother's knowing and voluntary action. He has since been diagnosed with Neonatal Abstinence Syndrome (NAS) by the Tennessee Early Intervention System (TEIS) and has been treated. NAS is a serious bodily injury and can cause severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately.

The trial court found clear and convincing evidence that mother had taken drugs during her pregnancy, despite knowing the adverse effects that it could have on the child. In making its ruling, the trial court stated the following:

[Mother] entered prison on January 7, 2013, during the 5th month of her pregnancy with [child], and was immediately placed in isolation for drug withdrawal…Before she was incarcerated, and during her pregnancy with [child], [mother] actively sought and frequently received prescription opiates, nerve pain pills and muscle relaxers. Available records indicate that during five (5) months of pregnancy prior to

incarceration, [mother] sought and received 240 Vicodin pills, 672 Tramadol pills, 270 Gabapentin pills, 90 Cyclobenzaprine pills, and 190 Oxycodone pills, totaling 1462 pills that her doctors told her were dangerous to babies in utero. Her doctors attempted to decrease dosages and expressed their concern for the expected child to [mother], and noted the risks of the particular medications in her records. They offered substitute alternate medications, but [mother] not only resisted, but also sought and sometimes received replacement prescriptions for medications she claimed were lost or stolen.

Mother's physicians warned her of the dangers of taking prescription opiates and other dangerous medication while pregnant. She was advised by medical professionals to discontinue her use for the duration of her pregnancy, but she refused. When the child first came to live with P.T. and K.T., as mother's doctors had warned her, the child showed signs of developmental delays. He was assessed by the Tennessee Early Intervention System and was found to be delayed in most of the categories tested. The record supports a finding that mother's prenatal drug use constituted severe child abuse. While the child may now be developing normally while under the care of P.T. and K.T., it remains unclear what long-term effects may develop.

Notably, even if the child does not manifest effects from the child abuse, this Court has found severe child abuse in the absence of an injury to or long-term effects on a child. "Severe abuse can be present even where the child does not manifest any lasting physical effect from mother's use of drugs." *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *12 (Tenn. Ct. App., filed Sept. 22, 2016). We have found that, even when a child enjoys a healthy childhood, "the healthy development of the child . . . does not diminish the severity of the harm to which the child was exposed." *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App., filed April 14, 2005). "[P]renatal abuse of controlled substances constitutes severe child abuse, whether or not the child actually suffers harm." *In re Shannon P.*, No E2012-00445-COA-R3-PT, 2013 WL 3777174, at *5 (Tenn. Ct. App., filed July 16, 2013). A child has the right "to begin life free from the impairment of drug addiction and other ill effects of prenatal drug abuse." *In re Benjamin M.*, 310 S.W.3d 844, 849 (Tenn. Ct. App. 2009).

We hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence supporting termination of mother's parental rights based on severe child abuse.

Next, P.T. and K.T. alleged in their petition that, on July 5, 2012, mother strangled her eleven year old daughter (H.D.), a half-sibling of the child. Following the assault, mother was arrested for driving while under the influence of alcohol. Mother has testified

that she "blacked out" from her alcohol consumption and does not recall everything that happened during the altercation.

During mother's plea hearing on this matter, she acknowledged that the police reports indicate that she slapped H.D. on the cheek, grabbed her from behind and choked her making it difficult for the child to breathe. Mother then was said to have pulled H.D.'s hair, dragging her to H.D.'s bedroom where mother proceeded to push H.D. down on the bed, crawled on top of her, and began choking her again. At the conclusion, mother slapped H.D. and threw a television at H.D. that landed on her foot. On November 1, 2012, mother pled guilty to domestic assault by strangulation. The trial court found that mother is "estopped from denying these facts and her conduct found under a prior court order."

The child's other half-sibling (D.B.) witnessed the events of July 5, 2012. The expert clinical psychologist testified to the harm that would result from being a victim of the assault and having witnessed the altercation. The trial court noted that the expert testified that "witnessing such an attack on a sister by a mother, would be likely to cause some of the various psychological problems listed in the definition of severe child abuse." Both victims suffer from posttraumatic stress disorder as a result of their experiences. As the trial court properly noted:

> Therefore, contained within this attack are three different perpetrations of severe child abuse; the first, physical upon [H.D.]; the second, psychological, upon [H.D.], and the third, psychological, upon [D.B.].

We hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence supporting termination of mother's parental rights based on severe child abuse for physical and psychological damage to the child's half-siblings.

On July 4, 2006, mother was arrested for driving while intoxicated with D.B. in the vehicle. This kind of reckless conduct has the potential to cause serious bodily injury and death to the child. As the trial court noted:

> While one incident is sufficient to establish this ground, but [sic] drinking and driving with her children apparently occurred on other occasions as well. When [D.B.] was almost 10 years old, following the attack on [H.D.], [D.B.] told a Minnesota child-welfare worker that her mother was a "good drunk driver."

We hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence supporting termination of mother's parental rights based on severe child abuse for driving while intoxicated with a child in the vehicle.

-14-

P.T. and K.T. allege in their petition that mother negligently entrusted her children to individuals that she knew were dangerous, including mother's father. Mother has maintained that her father sexually assaulted her throughout her childhood and into adulthood. Mother's father suffers from chronic alcoholism. Mother knew of the dangers of placing her children with her father. Mother failed to protect her children, and even put them in harm's way. The trial court found that mother had also entrusted her children to other unsuitable parties:

> From July 2012 to June 10, 2013, [mother] placed [D.B.] in the care of S.S., K.I. and both children with A.C., all of whom have criminal records and are otherwise poor choices of custodians.
>
> On September 25, 2005, Respondent entrusted [D.B.] to the child's father, who also obtained a driving while intoxicated charge with [D.B.] in the car. The father's blood alcohol content was .12 and he had to be tazed by officers during the arrest.
>
> On July 5, 2012, Respondent left her daughters in the care of V.T., who has an extensive criminal history, including crimes of violence. It was in fact, V.T., who eventually pulled Respondent [mother] off of her daughter, [H.D.], during the strangulation incident that resulted in a conviction.

The expert clinical psychologist in this matter testified to the effect that serial movement of caretakers can have on developing children:

> Some children are very resilient; most are not. So when they have gone through serial caretakers, when part of those home environments have been abusive, we see things like reactive attachment disorder, so sometimes you will see things like dissociative identity disorder where the child may actually kind of create another part of their personality to deal with a specific stressor, but that kind of fragmentation does not allow them to grow up. Panic attacks and anxiety absolutely can interfere with their ability to grow and progress. Social impairments. They're going to struggle having relationships with other people in their lives because those early relationships were missing in their life.

The trial court determined that:

> Serial movement of children between unsuitable homes is likely to cause both bodily injury due to foreseeable poor supervision, and poor judgment of supervisors, and according to expert testimony, also causes serious psychological injuries that rise to the level of severe abuse as well.

We agree. We hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence supporting termination of mother's parental rights based on severe child abuse.

**B.**

P.T. and K.T. state in their petition that grounds exist for termination of mother's parental rights based upon Tenn. Code Ann. § 36-1-113(g)(8)(B)(1). Petitioners must demonstrate two essential facts: (1) that Mother is presently unable to care for the subject children and (2) that Mother is unlikely to be able to care for the children in the near future. Tenn. Code Ann. § 36–1–113(g)(8) (2010).

Mother's psychological assessment indicated that she suffers from borderline personality disorder, major depressive disorder, recurrent episode, severe, with anxious distress, and post-traumatic stress disorder. The expert clinical psychologist testified extensively regarding how mother's borderline personality disorder renders her unable to properly meet the needs of her child. The expert testified that mother's Hamilton Depression Inventory indicated a clinically significant level of depression. The expert noted that her major depressive disorder meant that:

> There will be a lot of things she won't be able to do. She may not be able to get out of bed. Severe with anxious distress. So that is going to affect her parenting because she won't be available to her children.

Mother is prone to physically explosive tendencies with accompanying violent or aggressive behavior. The expert testified that her "anger is likely directed to people or things in her immediate environment which her family would catch the worst of it [sic]." The expert noted how mother's extreme degree of self-disclosure is problematic in that it indicates that the mother does not have a good sense of boundaries between herself and other people; this was said to "play out with her kids as far as her being able to set appropriate boundaries with the children." Mother historically cohabits with men who are physically and emotionally abusive, and many of which have criminal records. The expert testified that mother's sexuality being out of control is a "huge risk factor for her." The expert testified that mother "will not be able to put the needs of her children first if it requires any significant sacrifice from her. She needs to be parented at this point." The

expert was asked what the child's prognosis would be should he be sent to live with mother; the expert responded that his prognosis would be "very poor." The expert stated that there was no evidence of adjustments of conduct, circumstance, and condition to make it safe for the child to live with her, and that any lasting adjustments were improbable.

Based upon the foregoing, we hold, as a matter of law, that the evidence found by the trial court to be credible amounts to clear and convincing evidence that mother's mental condition is presently so impaired and so likely to remain that way, it is improbable that she would be able to assume care and responsibility for the child.

## C.

We next address whether the trial court erred in finding that clear and convincing evidence existed to terminate mother's parental rights for abandonment by failure to visit and failure to support. In pertinent part, Tenn. Code Ann. § 36–1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
> (1) Abandonment by the parent or guardian, as defined in § 36–1–102, has occurred;

As pertinent to this issue, Tenn. Code Ann. § 36–1–102(1)(A) defines abandonment to include willfully failing to visit, willfully failing to support, or willfully failing to make reasonable payments toward the support of the child for a period or four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate parental rights of the parent. Tenn. Code Ann. § 36–1–102(1)(A)(i).

The trial court found and held that clear and convincing evidence existed that mother had abandoned the child by failing to support child from December 22, 2015 through April 22, 2016. Mother was released from prison on December 21, 2015, and since that date, she has sent no gifts, clothing or food for the child. During the relevant time period, mother's interrogatories reflect that she was able-bodied and working for around $9.00-$10.00 per hour. Her housing was subsidized and her living expenses modest. Our review of the record indicates that the evidence found by the trial court to be credible amounts to clear and convincing evidence that mother's parental rights should be terminated under Tenn. Code Ann. § 36–1–113(g)(1).

P.T. and K.T. allege in their supplemental petition for termination of parental rights that grounds exist for termination of mother's parental rights based upon Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann.§ 36-1-102(1)(A)(i). P.T. and K.T. allege, and the trial court agreed, that mother failed to visit child from December 22, 2015 through April 22, 2016.

As noted above, mother was released from prison on December 21, 2015. At that time, mother was permitted by court order to contact the child once a week by mail through the Benton County Child Welfare Agency. Mother sent a letter directly to P.T. and K.T. mentioning her child following her release, but the substance of the letter concerned recovering her personal property. Mother has not sent mail addressed to the child since her release from prison, despite knowing the address and means of contact permitted. Notably, the relevant period included the child's third birthday, and yet no card or gift was sent.

As the trial court noted, mother was permitted to "file a motion in court to change the contact plan, once stability and sobriety is established…[N]o motion claiming stability or sobriety has been filed." While this Court acknowledges the limitations placed on mother's contact with child, the complete absence of any contact or attempted contact renders the abandonment willful. Therefore, we hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence to terminate mother's parental rights for willful abandonment by failure to visit.

The trial court found and held that clear and convincing evidence existed that mother had abandoned her child by willfully failing to support the child from June 30, 2016 to October 31, 2016. The trial court stated:

> This period of abandonment began after Respondent [mother] enjoyed six (6) months of liberty following her most recent incarceration. At this time, she had ample opportunity to benefit from the various services offered to her by the community corrections system, the child-welfare agencies of two states, and counsel appointed for her in this case. She was placed on high alert that her visitation and support choices could directly affect whether her parental rights to [child] were terminated by the first amended complaint filed in this case two months before this period began. That amended complaint sought termination of her parental rights for failure to visit or support the child. Still, her abandonment by failure to provide any support continued. This fact only bolsters the already clear evidence of willful abandonment.

Mother purports to be able bodied and employed. The mother has failed to pay support, offer to pay support, and failed to send gifts, clothing, or food for the child. We hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence of mother's willful failure to support the child.

-18-

The trial court found and held that clear and convincing evidence existed that mother had abandoned the child by willfully failing to visit the child from June 30, 2016 to October 31, 2016.

As noted above, mother is permitted to contact the child by mail during the relevant period, and has not done so. Her ongoing failure to attempt to contact and/or visit her child, despite being aware of her duty to do so, supports a finding that mother willfully abandoned the child by failing to visit. Therefore, we hold, as a matter of law, that the evidence found by the trial court amounts to clear and convincing evidence of mother's willful failure to visit the child.

**D.**

P.T. and K.T. allege that grounds exist for termination of mother's parental rights based upon Tenn. Code Ann. § 36-1-113(g)(14). They state that mother:

> failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

The trial court agreed:

> Collective proof of the other grounds establishes that Respondent [mother] is unable to assume physical custody of [child]. It simply is not safe.

> Respondent [mother] has, through her non-payment of support, manifested an unwillingness to assume financial responsibility for [child]. Respondent's demeanor, life choices, associates, and at least three psychological opinions support that Respondent [mother] poses a risk of substantial harm to both the physical and psychological welfare of any child in her custody.

The expert psychologist in this matter testified that placing the child in mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Mother continues to have issues meeting the terms of her parole, fails to demonstrate an ability and willingness to visit and support her child, and her psychological state is inadequate to meet the needs of a developing child. We hold that the evidence found by the trial court amounts to clear and convincing evidence

-19-

supporting termination of mother's parental rights based on failing to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

## VII.

We now focus on whether termination is in the child's best interest. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code. Ann. § 36-1-113(i), which provides as follows:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The record indicates that mother has not adjusted her lifestyle to make it safe and in the child's best interests to reside in her home. As recently as November 13, 2016, mother admitted to violating her parole by consuming alcohol. Mother's failure to meet the terms of her parole and continued consumption of alcohol indicates a clear failure to positively alter her conduct. While mother alleges some efforts to obtain stable housing, it is not clear that the shared housing in which she presently resides will be consistent or suitable for a developing child.

Mother has also failed to effect a lasting adjustment after reasonable efforts by available social services agencies. The trial court found that:

There have been years of child-welfare complaints and efforts to remediate [mother's] shortcomings by the child-welfare and criminal justice systems of the State of Minnesota. Sadly, [mother] has been physically and sexually victimized, and has abused alcohol since she was a child. She was diagnosed with mental illness early in life. All of these tragic problems have been amplified by time. She cannot make good decisions to

-21-

> keep herself safe. [Mother] has delayed or minimized many consequences of her behavior to secure sympathy and assistance from others. She has protected herself by denying facts and feigning imminent improvement. Her skilled manipulation has operated to the detriment of her children. The lasting adjustment necessary to make [mother] even a marginally fit parent is "not reasonably possible."

We agree. On appeal, mother contends that mother has never had a "true opportunity to parent the Child, visit, nor foster a meaningful relationship." Mother notes that the child was born while she was incarcerated. When mother was released her contact was restricted to one written letter per week. Mother reminds this Court that her prior contact with the child occurred when he was less than two years old. Mother alleges that these telephone conversations were incapable of substance, depth or warmth. Mother asks this Court not to weigh these factors against mother, "because it is a result of circumstance and not for a lack of Mother's effort or desire." After careful review, we are not persuaded by mother's argument. Mother has failed to make even the most modest efforts to establish a relationship. Mother and child not only do not have a meaningful relationship, they have none at all.

Mother argues that the trial court erred when it concluded that the child's best interests would be served by terminating mother's parental rights without analyzing why P.T. and K.T. voluntarily withdrew their petition asserting the same for D.B. We disagree. The fact that one of child's half-siblings desired to return to Minnesota is not outcome determinative in the adjudication of what is in the best interest of the child. As mother acknowledges in her brief, the trial court discussed the other half-sibling, noting that D.B. "moved from the home of Petitioners to Tennessee state custody on March 8, 2016, at her request and after surreptitious contact with [mother]." The trial court heard testimony from K.T. at trial regarding D.B.'s desire to no longer be adopted. K.T. testified that D.B. became distant and withdrawn after surreptitiously contacting her mother. Prior to this contact, K.T. testified that D.B. was excited about the adoption, and even had chosen a new name. K.T. testified that when D.B. no longer wanted to be adopted, her and her husband did not want to force that upon D.B.

As noted above, "[W]hen a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court exercised its discretion, and we hold did not abuse that discretion.

The expert testified that a change of caretakers is likely to have a detrimental effect on the child, and that the mother has a demonstrated inability to provide an environment that is consistent and free from abuse or neglect. Mother's emotional and mental state has proven to not be conducive with a stable environment for the child. Mother has failed to seek the assistance necessary to improve her situation. Accordingly, we hold, as a matter of law, that the evidence found by the trial court to be credible amounts to clear and convincing evidence that termination of mother's parental rights is in the child's best interest.

## VIII.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE